**BANCO NACIONAL DE CUBA,**
Plaintiff-Appellant-Cross-Appellee,

v.

**CHASE MANHATTAN BANK,**
Defendant-Appellee-Cross-Appellant.

**Nos. 111, 192, Dockets 80–7375, 80–7377.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 26, 1981.

Decided Aug. 4, 1981.

Victor Rabinowitz, New York City (Michael Krinsky, Judith Levin, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, New York City, on the brief), for plaintiff-appellant-cross-appellee.

Andrew J. Connick, New York City (Milbank, Tweed, Hadley & McCloy, New York City, on the brief), for defendant-appellee-cross-appellant.

Before LUMBARD, VAN GRAAFEILAND, and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

This is an appeal from a final judgment in one of a number of cases arising out of the revolution in the Republic of Cuba in the late 1950's and the subsequent expropriation by the Cuban government of properties owned by American companies.[1] In the present action, Banco Nacional de Cuba ("Banco Nacional"), a Cuban state-owned bank, sought to recover $9,794,022 from Chase Manhattan Bank ("Chase") on claims whose validity is not in dispute. Chase asserted several counterclaims seeking damages for the expropriation by Cuba of branch banking assets owned by Chase in its own right (hereinafter sometimes "branch counterclaim"), and of railroad equipment owned by Chase as a trustee for certain American investors (hereinafter sometimes "railroad equipment counterclaims"). The United States District Court for the Southern District of New York, Charles L. Brieant, Jr., Judge, entered judgment in favor of Banco Nacional on its claim, less $6,904,870 allowed as a set-off on account of Chase's counterclaim for expropriation of its Cuban branches, and dismissed the remaining counterclaims. Banco Nacional has appealed, asserting that Chase's branch counterclaim was not justiciable and that the valuation of Chase's Cuban branches was, in any event, too high. Chase has cross-appealed, challenging the dismissing of its railroad equipment counterclaims and arguing that the district court did not adequately value its branches as a going concern.

While we are in agreement with most of the district court's rulings, we conclude that a realistic appraisal of conditions in Cuba required a lower valuation of Chase's Cuban branches. The judgment should be modified accordingly and as modified, it is affirmed.

## I. FACTS

The events surrounding the Cuban revolution have spawned extensive litigation, giving this Court and others several opportunities to review the facts of the overthrow of the Batista regime and the organization and installation of the current government. *See, e. g., Banco Nacional de*

---

1. This is one of six appeals decided today relating to property of American banks. The other five cases are *Banco Para el Comercio Exterior de Cuba v. First National City Bank*, No. 80–7297, 658 F.2d 913 (2nd Cir.), *First Bank of Boston (International) v. Banco Nacional de Cuba*, No. 80–7299, 658 F.2d 895 (2nd Cir.); *Banco Nacional de Cuba v. Chemical Bank*

*New York Trust Co.*, No. 80–7209; *Banco Nacional de Cuba v. Irving Trust Co.*, No. 80–7205; and *Banco Nacional de Cuba v. Manufacturers Trust Co.*, No. 80–7215. The last three cases were consolidated for argument and were decided in a single opinion, 658 F.2d 903 (2nd Cir.).

*Cuba v. First National City Bank*, 270 F.Supp. 1004 (S.D.N.Y.1967), *rev'd*, 431 F.2d 394 (2d Cir. 1970), *vacated and remanded*, 400 U.S. 1019, 91 S.Ct. 581, 27 L.Ed.2d 630 (1971), *on remand*, 442 F.2d 530 (2d Cir. 1971), *rev'd* 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), *on remand*, 478 F.2d 191 (2d Cir. 1973); *Banco Nacional de Cuba v. Sabbatino*, 193 F.Supp. 375 (S.D.N.Y.1961), *aff'd* 307 F.2d 845 (2d Cir. 1962), *rev'd* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), *on remand sub nom. Banco Nacional de Cuba v. Farr*, 243 F.Supp. 957 and 272 F.Supp. 836 (S.D.N.Y.1965) *aff'd*, 383 F.2d 166 (2d Cir. 1967), *cert. denied*, 390 U.S. 956, 88 S.Ct. 1038, 20 L.Ed.2d 51 (1968). Familiarity with these discussions is assumed.

## A. The Expropriations

The Cuban revolution resulted in the installation of a new national government on January 1, 1959, under the leadership of Fidel Castro Ruz, Che Guevera, and others.[2] The new regime viewed itself as the lawful successor to its predecessor, the Batista government, and effected substantial changes in Cuba primarily by building on preexisting laws and institutions. A number of statutes were enacted, and decrees announced, in pursuit of two general goals: to concentrate the means of production in the hands of the Cuban government and to restrict greatly the role of foreign enterprises in the Cuban economy.

On July 6, 1960, following a serious deterioration of relations between Cuba and the United States, Cuba enacted Law No. 851 which, inter alia, authorized the President and Prime Minister of the Republic "to order[ ] the nationalization through forced expropriation of the assets or firms owned by natural or legal persons of United States citizenship . . . ." Under this law Cuba nationalized numerous American-owned corporations, branches, and businesses. On September 17, 1960, an executive order pursuant to Law 851, denominated "Resolution No. 2," expropriated and nationalized the four Cuban branches of Chase. The Cuban assets of First National City Bank ("Citibank") and First National Bank of Boston ("First Boston") (*see* note 1, *supra*) were expropriated by the same Resolution;[3] and thereafter, on October 13, 1960, pursuant to a new law, Law No. 891, virtually all remaining private banking firms were nationalized.[4]

On October 13, 1960, the Cuban government also promulgated Law No. 890, which nationalized "through forced expropriation" all business, industrial enterprises, and other property of railroads operating in Cuba.

Each of the above laws provided that, under certain circumstances, payment would be made by the Cuban government for the expropriated assets. The parties have stipulated that no payment was made.

## B. Banco Nacional and Its Claims

Since its formation in 1948, Banco Nacional has functioned as the central Bank of Cuba. Prior to the revolution, one-half of its stock was owned by the Cuban government, which appointed its president and three of its five directors. The remaining one-half of its stock was owned by private banks, which were required to subscribe thereto. Banco Nacional engaged in domestic and international banking, was the

---

**2.** *See, e. g.*, H. L. Matthews, *Revolution in Cuba* 112–22 (1975).

**3.** The Resolution read in part as follows:

> *We Resolve:*
> First: To order the nationalization, by expropriation, and, consequently, award to the Cuban Government, in absolute ownership, all the assets, rights and shares deriving from the utilization thereof, especially the banks, including all their branches and agencies located in Cuba, which are the property of the following legal persons:

1—The First National City Bank of New York
2—The First National Bank of Boston
3—The Chase Manhattan Bank
Second: Consequently, the Cuban Government is substituted for the legal persons named in the foregoing paragraph as to the aforesaid assets, rights and shares, as well as the assets and liabilities of the aforementioned companies.

**4.** Law No. 891 did not call for the nationalization of Canadian-owned banks, which were acquired by the Republic at a later date.

sole depository of state funds, and was granted extensive powers both to control and protect the Cuban currency in international trade and to regulate all commercial banks operating in Cuba.

After the revolution Banco Nacional was granted additional powers and played a key part in restructuring the Cuban economy in general and the banking industry in particular. Under Resolution No. 2, Banco Nacional was designated the instrumentality to take over the assets and businesses of Chase, Citibank and First Boston. Under Law No. 891, Banco Nacional was similarly placed in control of the assets and businesses of the remaining private banks, and thereafter became wholly owned and operated by the Cuban government. Banco Nacional did not have a similar role with respect to nationalization of the railroads under Law No. 890. That law was to be administered by the Corporación Nacional de Transportes.

Banco Nacional commenced the present action in 1960, asserting several claims totaling $9,794,022, the validity of which is not contested by Chase. First, Banco Nacional sought to recover some $7 million as successor in interest to two other Cuban state-owned banking enterprises, Banco de Desarollo Económico y Social ("Bandes") and Fonda de Establización de la Moneda ("Fonda"). In 1958 Chase had loaned Bandes $30,000,000, secured by United States Government obligations owned by Fonda and having a face value in excess of $30,000,000. Banco Nacional succeeded these two enterprises in February 1960 and made payments on the loans. On September 17, 1960, the date on which Cuba expropriated Chase's branches, the unpaid balance of the loan was $10,000,000. Within days of the expropriation, Chase sold the collateral then in its possession for more than $17,000,000, applied the proceeds against the outstanding loan balance (including accrued interest), and held a surplus of $7,256,398. Chase notified Bandes and

Banco Nacional of the sale and informed them that the surplus would not be returned but rather would be retained to offset Chase's losses resulting from the expropriation.

In addition, Banco Nacional sought to recover in its own right for various sums it had on deposit with Chase on September 17, 1980, aggregating $2,537,622. Chase refused to repay those sums, and instead applied them against obligations allegedly owed it by the Republic of Cuba, its agencies and instrumentalities.

## C. Chase's Counterclaims

Chase asserted four counterclaims. The branch counterclaim alleged that Chase had been engaged in branch banking in Cuba continuously since 1925 and at the time of the expropriation maintained four branches. Chase alleged that the properties, which it valued at $8,619,457, had been converted in violation of international law, and sought full recovery from Banco Nacional as the alter ego of the Cuban government. Chase also asserted an alternative counterclaim for the loss of its Cuban branches based on an implied contract theory. This counterclaim asserted that under Law No. 851 Banco Nacional succeeded to all of the liabilities of the seized branches, and that Chase's Cuban branches were indebted to Chase for approximately $6,000,000.

Chase stated two counterclaims in its capacity as trustee for American investors owning railroad equipment leased to the Cuban Railroad Company and Cuban Northern Railways Company under financing leases. This equipment, valued by Chase at $4,047,910, was nationalized on October 13, 1960, and Chase, as Trustee, sought recovery on behalf of the equipment trust certificate owners.

Chase did not seek affirmative relief on its counterclaims, the total value of which exceeded the amount sought by Banco Nacional, but merely requested that Banco Nacional's complaint be dismissed.[5]

---

**5.** Under *National City Bank v. Republic of China*, 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955), the immunity of a foreign sovereign

from suit does not bar interposition of counterclaims, once the sovereign itself has brought suit, but the amount recoverable on the coun-

## D. Decision of the District Court

The case was tried before the late Judge Frederick van Pelt Bryan who died without having rendered a decision. The action was then assigned to Judge Brieant who, with the agreement of the parties, decided the case on the basis of the record made before Judge Bryan.

In a reasoned opinion, reported at 505 F.Supp. 412, Judge Brieant ruled that, for purposes of Chase's branch counterclaim, Banco Nacional is the alter ego of the Cuban government,[6] that the branch counterclaim is justiciable, and that Chase is entitled to a set off on this counterclaim in the amount of $6,904,870. The court dismissed Chase's implied contract counterclaim on its merits. Chase's counterclaims as railroad equipment trustee were dismissed on the ground that these counterclaims could not properly be interposed under Fed.R.Civ.P. 13(b).[7] Banco Nacional's claims not having been disputed, judgment was entered for Banco Nacional in the net amount of $2,889,150, with the instruction that Chase pay that amount into a special account controlled by federal authorities under the Cuban Assets Control Regulations, 31 C.F.R. Part 515 (1980).[8]

## E. Issues on Appeal

On this appeal Banco Nacional argues that the district court erred in allowing Chase to assert its counterclaim for the expropriation of its Cuban branches, contending that, under Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) ("Sabbatino"), the act of state doctrine bars the court from adjudicating the counterclaim, and that the amount of compensation, if any, due under international law for an expropriation of property is a nonjusticiable, political question. In addition Banco Nacional contends that the court overvalued Chase's Cuban assets in several respects.

Chase makes two principal arguments in support of its cross appeal. First, as to its branch counterclaim, it contends that the district court placed too low a going-concern valuation on the branches, and that the amount of the setoff it was allowed should therefore have been higher.[9] Second, Chase contends that it should have been allowed

terclaims may not exceed the value of the sovereign's claims. Id. at 358, n. 2, 75 S.Ct. at 425, n. 2; see United States v. Shaw, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888 (1940).

6. In Banco Nacional de Cuba v. First National City Bank, supra, 478 F.2d at 193, we held that for the purposes of this litigation Banco Nacional is the alter ego of the Republic of Cuba....

The undisputed evidence in the record amply supports the conclusion that Banco Nacional and the government of Cuba acted as one in the nationalization of National City Bank's property.

Given the identical laws and circumstances leading to the expropriation of the Citibank and Chase branches, see note 3 supra, and accompanying text, the district court held that ruling equally applicable to the present case. This conclusion appears to be eminently correct, see Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); Shore v. Parklane Hosiery Co., Inc., 565 F.2d 815, 818–19 (2d Cir. 1977), aff'd, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), and it has not been challenged on this appeal.

7. These counterclaims had been dismissed in 1974 by Judge Bryan in an oral decision.

While Judge Brieant discussed the basis for the ruling at some length, see 505 F.Supp. at 435–42, a substantial part of the discussion quoted a draft by Judge Bryan, and Judge Brieant did not consider that he himself had made an "independent decision" to dismiss, id. at 435.

8. Congress has established a procedure by which the Foreign Claims Settlement Commission of the United States is to determine the amount and validity of claims of American nationals against the Cuban government. 22 U.S.C. §§ 1643–43k (1976). Amounts recovered by Cuba or its nationals in actions in the United States are in effect frozen, see 31 C.F.R. Part 515, and may later be included in a fund to be administered by the Commission pursuant to further congressional instruction.

9. Chase's implied contract counterclaim for loss of its branches was asserted as an alternative in case its conversion theory was rejected, and Chase's appeal from the dismissal of the implied contract counterclaim is similarly stated as a "fall back" position. Since we uphold the branch counterclaim on the conversion theory, we need not address the implied contract theory.

to pursue its two counterclaims asserted in its capacity as trustee of the railroad equipment that was nationalized on October 13, 1980.

We have examined all of the arguments of the parties and find merit only in Banco Nacional's contention that Chase was not entitled to recover for the "going concern" value of its branches.

## II. JUSTICIABILITY OF THE BRANCH COUNTERCLAIM

We turn first to the question of whether Chase's counterclaim with respect to the expropriation of its Cuban branches is justiciable. Notwithstanding the rule laid down in *Sabbatino,* we conclude that the district court's decision that the branch counterclaim is justiciable was compelled by the Supreme Court's decision in *First National City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) ("*Citibank I*").

### A. *The Act of State Doctrine*

The history and development of the centuries-old act of state doctrine were thoroughly explored by the Supreme Court in *Banco Nacional de Cuba v. Sabbatino, supra.* Prior to *Sabbatino,* although there was considerable disagreement as to the precise contours of the doctrine, *see generally* Note, *Rehabilitation and Exoneration of the Act of State Doctrine,* 12 N.Y.U.J. Int'l Law & Pol. 599, 601–10 (1980), the doctrine was generally viewed as having its origins in principles of sovereign immunity, *id.* at 600–01; *Sabbatino, supra,* 376 U.S. at 445–50, 84 S.Ct. at 949–51 (White, J., dissenting), and in the United States it was generally described as barring the courts of this country from adjudicating the validity of acts of the government of another country committed within its own territory. *See, e. g., Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897).

In *Sabbatino,* which arose out of the Cuban government's expropriation of the Cuban assets of an American commodities broker who had contracted to purchase Cuban sugar, the Supreme Court reexamined the foundations of the doctrine and arrived at a new formulation. Briefly, the Court rejected the traditional sovereign immunity analysis of the doctrine, 376 U.S. at 421, 84 S.Ct. at 936, and found it rooted, principally, in the Constitution's separation of the powers of the three branches of government, *id.* at 423, 84 S.Ct. at 937. The Court described the doctrine as a principle of decision that is not technically required by the Constitution, but that must nevertheless reflect "the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs." *Id.* at 427–28, 84 S.Ct. at 939–40. Further, it observed that the propriety of a court's adjudication of a particular type of international law question increased as the degree of codification or consensus as to the substantive principles concerning the area increased. *Id.* at 428, 84 S.Ct. at 940. Recognizing the need for flexibility in accommodating the role and needs of the Executive Branch in dealing with matters affecting the country's international relations, the Court announced that

> the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.

*Id.*

The Court proceeded to review the sharp divergence of views as to the limitations on a state's power to expropriate property of aliens within its borders, *id.* at 428–30, 84 S.Ct. at 940–41, and to remark on social and ideological schisms underlying some of the disagreements as to the standards relating to expropriations. *Id.* at 430, 84 S.Ct. at 941. Concluding that it could easily risk interference with the Executive Branch's negotiations by passing on questions arising in so uncertain an area, the Court held that the act of state doctrine foreclosed inquiry

into the Cuban expropriation of the Cuban assets of the sugar broker, even if the expropriation violated international law.

## B. *The Decision in* Citibank I

While the result and reasoning of *Sabbatino* would appear to require that Chase's present counterclaims be held nonjusticiable under the act of state doctrine, later action by the Supreme Court dictates the contrary result. *Citibank I*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466, involved precisely the same factors as exist here with respect to Chase's branch counterclaim: Citibank sought a setoff for the expropriation on September 16, 1960, pursuant to Resolution No. 2 of Law No. 851, of its Cuban branches, up to the amount of claims asserted by Banco Nacional to recover for deposits that Citibank refused to repay and to recover a surplus realized by Citibank on the sale of collateral held as security for a loan to Bandes. After an initial decision by the district court holding Citibank's counterclaim justiciable,[10] this Court ruled that the act of state doctrine as set forth in *Sabbatino* barred adjudication of Citibank's counterclaim, 431 F.2d 394. At the direction of the Supreme Court, 400 U.S. 1019, 91 S.Ct. 581, 27 L.Ed.2d 630, we reviewed our decision in light of a letter from the Legal Advisor of the Department of State advising that the foreign policy interests of the United States would not be injured by adjudication of the merits of the counterclaim, 442 F.2d 530, and we adhered to that decision notwithstanding our ruling some years before in *Bernstein v. N. V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij*, 210 F.2d 375 (2d Cir. 1954) ("*Bernstein*"). In *Bernstein* we had initially refused to allow adjudication of the validity of acts of the Nazi government of Germany in the absence of any expression of views from the Executive Branch, *see* 173 F.2d 71, but had reversed that decision and, as an exception to the act of state doctrine, allowed adjudication after receiving advice from the Acting Legal Advisor to the State Department that was expressly intended " 'to relieve American courts from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials.' " 210 F.2d at 376.

---

10. Following the Supreme Court's decision in *Sabbatino*, Congress sought to blunt the effect of that decision by passing the Hickenlooper Amendment to the Foreign Assistance Act of 1964, 22 U.S.C. § 2370(e)(2), as amended, 79 Stat. 658–659 (Sept. 6, 1965), which states as follows:

(2) Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party including a foreign state (or a party claiming through such state) based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law, including the principles of compensation and the other standards set out in this subsection: *Provided*, That this subparagraph shall not be applicable (1) in any case in which an act of a foreign state is not contrary to international law or with respect to a claim of title or other right to property acquired pursuant to an irrevocable letter of credit of not more than 180 days duration issued in good faith prior to the time of the confiscation or other taking, or (2) in any case with respect to which the President determines that application of the act of state doctrine is required in that particular case by the foreign policy interests of the United States and a suggestion to this effect is filed on his behalf in that case with the court. The constitutionality of this amendment was upheld in *Banco Nacional de Cuba v. Farr, supra*.

The district court in the *Citibank I* litigation relied on the Hickenlooper Amendment in holding Citibank's counterclaims justiciable. 270 F.Supp. at 1007–10. On appeal, we thoroughly reviewed the history of the Amendment, and concluded that the Amendment was intended to afford American firms a "day in court" if some entity attempted to market their expropriated Cuban property in the United States, and was not intended to permit a setoff in all cases. 431 F.2d at 399–402. Although our decision reversing on this basis was vacated and remanded by the Supreme Court for reconsideration in light of the State Department's proffered *Bernstein* letter, *see* text following this note, the Supreme Court expressed no opinion on the merits of our view of the applicability of the Amendment either at that time, 400 U.S. 1019, 91 S.Ct. 581, 27 L.Ed.2d 630 (1971), or after our adherence to our view on reconsideration, *see* 442 F.2d 530 (1971), *reversed on other grounds*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466.

The Supreme Court, in *Citibank I*, voted 5–4 to reverse our ruling that the Citibank counterclaim was nonjusticiable. The Court did not, however, agree on a rationale. Three members of the Court expressly relied on the *Bernstein* exception, to the effect that the act of state doctrine does not apply when the Executive Branch supports adjudication. 406 U.S. at 760–70, 92 S.Ct. at 1809–14 (Rehnquist, J., joined by the Chief Justice and Justice White). These three Justices found *Sabbatino* not dispositive because in that case the State Department, while opining that the Cuban expropriations violated international law, had stated its "wish not to make any statement bearing on [that] litigation," *Sabbatino*, 376 U.S. at 420, 84 S.Ct. at 936; the *Sabbatino* court had expressly declined to rule on the "*Bernstein*" exception. *Id.* at 420, 436, 84 S.Ct. at 936, 944. In *Citibank I*, in contrast, the Legal Advisor to the State Department urged the Court, in a letter dated November 17, 1970, to adjudicate issues as to which the Executive Branch publicly advised the Court that the act of state doctrine need not be applied, and stated that the doctrine need not be applied to claims such as those asserted by Citibank:

> "The Department of State believes that the act of state doctrine should not be applied to bar consideration of a defendant's counterclaim or set-off against the Government of Cuba in this or like cases."

*Citibank I*, 406 U.S. at 764, 92 S.Ct. at 1811. The three Justices concluded that

> where the Executive Branch, charged as it is with primary responsibility for the conduct of foreign affairs, expressly represents to the Court that application of the act of state doctrine would not advance the interests of American foreign policy, that doctrine should not be applied by the courts.

406 U.S. at 768, 92 S.Ct. at 1813.

One member of the majority, Justice Douglas, found the Citibank situation governed not by *Sabbatino* or *Bernstein*, but by *National City Bank v. Republic of China*, 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed.2d 389 (1955), in which the Court had held that when a foreign sovereign brings suit in an American court under American laws, in fairness it may not assert sovereign immunity as a defense to a counterclaim that is limited to the amount of the sovereign's claim. *Citibank I*, 406 U.S. at 770–71, 92 S.Ct. at 1814–15. Justice Douglas thus concurred in the *Citibank I* result on grounds of " 'fair dealing,' " but emphasized that to the extent that the defendant's counterclaim exceeded the value of the main claim, it would be nonjusticiable under *Sabbatino*. *Id.* at 772–73, 92 S.Ct. at 1815.

The fifth member of the majority, Justice Powell, found neither *Bernstein* nor *Republic of China* controlling. Justice Powell viewed *Sabbatino* as implicitly disapproving the *Bernstein* exception, the *Sabbatino* majority's disclaimers notwithstanding, and in addition viewed as inappropriate a rule that would require the judiciary to receive the Executive Branch's permission in order to proceed. *Citibank I*, 406 U.S. at 773, 92 S.Ct. at 1815. He viewed *Republic of China* as not dispositive because that case dealt with the foreign sovereign's amenability to the court's jurisdiction, rather than with the justiciability of a claim between parties concededly subject to that jurisdiction. 406 U.S. at 773–74, 92 S.Ct. at 1815–16. Nevertheless, Justice Powell concluded that *Sabbatino* did not bar adjudication of Citibank's counterclaim. Noting that had he been a member of the *Sabbatino* Court he would likely have joined the dissenting opinion of Justice White, Justice Powell found *Sabbatino*'s breadth unacceptable. In his view, the courts should adjudicate claims relating to foreign expropriations "[u]nless it appears that an exercise of jurisdiction would interfere with delicate foreign relations conducted by the political branches." *Id.* at 775, 92 S.Ct. at 1816. Finding that no such conflict had been shown, Justice Powell voted to reverse the dismissal of Citibank's counterclaim.

The four dissenting Justices, in an opinion by Justice Brennan, took sharp issue with each of the views espoused by the Justices comprising the majority, viewing

the reasoning and result of *Sabbatino* as mandating the dismissal of Citibank's counterclaim.

Thus, none of the various rationales proffered by the members of the majority attracted more than three votes. The *Bernstein* exception, adopted by three Justices, was explicitly rejected by six; the view that *Republic of China* controlled was expressed only by Justice Douglas, although the opinion of Justice Rehnquist for himself and two other members of the Court saw that situation as "closely analogous," *id.* at 769, 92 S.Ct. at 1814; and Justice Powell's view that *Sabbatino* should be so narrowly interpreted as to be inapplicable to Citibank's counterclaims, was his view alone.

But while the divergent views of the majority appear to provide no common ground from which we may articulate a *Citibank I* rationale,[11] we are bound to reach the same result as *Citibank I* where there is no significant difference in circumstance.

## C. *Application of* Citibank I

█ Cumulating the views of the Justices comprising the *Citibank I* majority, we arrive at the following phenomenological rule: where (1) the Executive Branch has provided a *Bernstein* letter advising the courts that it believes act of state doctrine need not be applied, (2) there is no showing that an adjudication of the claim will interfere with delicate foreign relations, and (3) the claim against the foreign sovereign is asserted by way of counterclaim and does not exceed the value of the sovereign's claim, adjudication of the counterclaim for expropriation of the defendant's property is not barred by the act of state doctrine.[12] We find all three conditions satisfied by Chase's branch counterclaims.

█ In the present case there are three State Department communications pertinent to the Executive Branch's views. The first is the November 17, 1970, letter described above in connection with the *Citibank I* litigation, in which the Department took the position that the act of state doctrine should not be applied in that "or like" cases. The present case involving Chase is certainly "like" *Citibank I*, the expropriations of both Chase and Citibank branches having occurred in September 1960, pursuant to Law No. 851 and Resolution No. 2. On July 24, 1973, the State Department wrote to Chase's counsel stating that the Department continued to hold the view expressed in the November 17, 1970, letter with respect "to 'this or like cases.' " Finally, on June 11, 1980, the Department confirmed that it still held those views, and stated that the present Chase litigation and the current Citibank litigation [13] "definitely appear to be 'like cases' to" *Citibank I.*

Hence, Chase has the benefit of *Bernstein* letters from the State Department; there has been no showing of any respect in which the adjudication of its claim will in-

11. The guidance provided by the Supreme Court for interpreting its plurality opinions is that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds ....' " *Gregg v. Georgia*, 428 U.S. 153, 169 n.15, 96 S.Ct. 2909, 2923 n.15, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)." *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977). *See* Davis & Reynolds, *Juridical Cripples: Plurality Opinions in the Supreme Court*, 1974 Duke L.J. 59; Hardisty, *Reflections on Stare Decisis*, 55 Ind.L.J. 41, 52–57 (1979); Note, *The Precedential Value of Supreme Court Plurality Decisions*, 80 Colum.L.Rev. 756 (1980); Note, *Plurality Decisions and Judicial* *Decisionmaking*, 94 Harv.L.Rev. 1127 (1981). The three views of the Justices comprising the majority in *Citibank I* are not so reconcilable.

12. Our recent decision in *Empresa Cubana Exportadora de Azucar y Sus Derivados v. Lamborn & Co.*, 652 F.2d 231 (2d Cir. 1981, as amended by order filed June 17, 1981), does not contradict this formulation. In *Lamborn*, we held that the act of state doctrine was applicable to bar recovery, by way of either complaint or counterclaim, for assets seized by the Cuban government. The party seeking to recover from the Cuban government in *Lamborn* had no *Bernstein* letter, and the Executive Branch had expressed no view as to the applicability of the act of state doctrine in that case.

13. *See* note 1 *supra.*

terfere with United States foreign relations; and its claim is asserted by way of setoff. The decision of the Supreme Court in *Citibank I* compels the conclusion that Chase's branch counterclaim is justiciable.

■■■ Finally, we find no merit in Banco Nacional's argument that even if the counterclaim is justiciable, the damage issue is nonjusticiable because there is insufficient international consensus as to standards of required compensation. Although we agree that it is difficult to state precisely what international law requires regarding damages for expropriation, *see* Part IV.A., *infra,* and we note that this was a consideration of the majority in *Sabbatino* in deciding to apply the act of state doctrine, *see* 376 U.S. at 429–30, 84 S.Ct. at 940–41, we conclude that in cases such as the present one any argument as to the justiciability of damages has been foreclosed by the *Citibank I* decision as to the justiciability of the counterclaim in which those damages are sought. Thus, the opinion of Justice Rehnquist in *Citibank I* indicated that where, as here, the act of state doctrine is inapplicable, a court of the United States "will decide cases before it by choosing the rules appropriate for decision from among various sources of law including international law." 406 U.S. at 763, 92 S.Ct. at 1811 (citation omitted). For Justice Douglas, the very conclusion that justiciability turned on the amount of the counterclaim necessarily contemplated that valuation issues were to be decided. *Id.* at 772, 92 S.Ct. at 1815. And Justice Powell, who found no political reason to apply the act of state doctrine, stated "... I conclude that federal courts have an obligation to hear cases such as this.... I think the courts have a duty to determine and apply the applicable law." *Id.* at 775–76, 92 S.Ct. at 1816–17. Thus, when the Supreme Court in *Citibank I* held

that Citibank's counterclaim was justiciable, it clearly indicated that a judgment should be reached as to the worth of that counterclaim for setoff purposes.

## III. CHASE'S COUNTERCLAIMS AS TRUSTEE

We turn next to Chase's railroad equipment counterclaims. Chase asserted these two counterclaims seeking approximately $4,000,000 in its capacity as trustee for American investors who supplied railroad equipment to two Cuban railroad companies pursuant to financing leases. The district court dismissed these counterclaims principally on the ground that when suit has been brought against a defendant in one capacity, Fed.R.Civ.P. 13(b) does not permit the defendant to counterclaim in another capacity. On the present facts, we agree.[14]

■■ Rule 13(b) states as follows:

(b) Permissive Counterclaims. A pleading may state as a counterclaim any claim against an opposing party not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim.

The principal goal of the Rule, which plainly indicates that a counterclaim may be asserted against only "an opposing party," is to permit the resolution of all controversies between the parties in a single suit. *See Alaska Barite Co. v. Freighters Inc.,* 54 F.R.D. 192, 195 (N.D.Cal.1972); 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1420, at 112 (1971). The generally prevailing, although not uniform, view is that the "opposing party" requirement means that when a plaintiff has brought suit in one capacity, the defendant may not counterclaim against him in another capacity. *See* 3 Moore's *Federal Practice* ¶ 13.06[1]

---

14. We reject Chase's argument that New York law requires that its railroad equipment counterclaims be allowed. The permissibility of a counterclaim is a matter of procedure, *see* 3 Moore's Federal Practice, ¶ 13.02, at 13–57 through 13–62 and ¶ 13.18, at 13–456 (1980), which in a federal court is governed by federal, not state, law. *See Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). The

application of Rule 13 is not "outcome determinative," since it does not affect the parties' substantive rights on the railroad equipment claims, *see Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). Although the beneficiaries of the trust will not recover here, their substantive right to do so remains unaltered.

(1980); 6 C. Wright & A. Miller, *supra*, § 1404, at 16; *United States v. Timber Access Industries Co.*, 54 F.R.D. 36, 39–40 (D.Or.1971); *Chambers v. Cameron*, 29 F.Supp. 742 (N.D.Ill.1939). *Cf.* Clark, *Code Pleading* § 104, at 671–75 (2d ed. 1947). In some instances the courts have looked beyond the capacities of the parties in order to determine who were the real parties in interest, *see* 6 C. Wright & A. Miller, *supra*, § 1404, at 17; Clark, *supra* at 672, and have allowed a counterclaim where closely similar interests were involved, *cf. Scott v. United States*, 354 F.2d 292 (Ct.Cl.1965), but have dismissed the counterclaim where a clearly different person not a party was the real party in interest. *See Durham v. Bunn*, 85 F.Supp. 530 (E.D.Pa.1949).

■ Whether a defendant who has been sued in one capacity may assert a counterclaim in a different capacity has been the subject of less discussion, but again it appears that the traditional view is that a defendant may counterclaim only in the capacity in which he has been sued. *See id.* at 531 (dismissing counterclaims where defendant who had been sued personally was "not personally seeking relief in the counterclaim but solely in behalf of another, not party to the suit"); *Dunham v. Crosby*, 435 F.2d 1177, 1181 (1st Cir. 1970) (dictum).[15]

■ In the present case we are persuaded that the "opposing party" requirement has not been met. Banco Nacional did not sue Chase in its capacity as trustee; nor has it asserted any claims against the trust, or its assets (if any remain), or its beneficiaries. Technically, therefore, we view Banco Nacional as not a party opposing Chase as Trustee.[16]

Moreover, although we recognize that it will not always be wise to apply the "opposing party" rule mechanically, *see, e. g., Moore McCormack Lines, Inc. v. McMahon*, 235 F.2d 142 (2d Cir. 1956), we find sound reasons for not dispensing with the requirement here. First, the principal policy underlying Rule 13(b) would not be advanced by a relaxation of its requirements in this case. Since the total amount sought by the branch counterclaim and the railroad equipment counterclaims exceeds the value of Banco Nacional's claim and would be assertable only as a setoff, the railroad equipment counterclaims, if proved, would not be extinguished by this suit, but could be asserted in other litigation should the Cuban government bring an appropriate suit. *See* Restatement (Second) of Judgments § 56 (Tent. Draft No. 1, 1973).[17] Hence, allowance of the railroad counterclaims would neither bring about the resolution of all

---

15. *See also Aldens, Inc. v. Packel*, 524 F.2d 38 (3d Cir. 1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976), in which the court was forced to choose between competing legal fictions in order to determine whether a state Attorney General, in a suit against him challenging the constitutionality of a statute, could counterclaim on behalf of the state for a declaration that the statute was constitutional, pursuant to Rule 13(a) which generally requires that a counterclaim be asserted "against any opposing party" if it arises out of the same transaction or occurrence as the opposing party's claim. Not surprisingly, recognizing that the fundamental policy underlying Rule 13 is the expeditious resolution of all controversies arising out of the same occurrence between the same parties in a single suit, the court chose the view that the Attorney General was the alter ego of the state for these purposes.

16. We also doubt that for purposes of the expropriation of the railroad equipment, Banco Nacional should be deemed the alter ego of the Cuban government which, for that expropriation acted through its Transportation Corpora-

tion, not through Banco Nacional. *See* our discussions today in *Banco Para el Comercio Exterior de Cuba v. First National City Bank, supra,* and *Banco Nacional de Cuba v. Chemical Bank & Trust Co., supra.*

17. Section 56 of the Restatement (Second) of Judgments states as follows:

(1) Where the defendant interposes a counterclaim on which judgment is rendered in his favor, the rules of merger are applicable to the claim stated in the counterclaim, except as stated in Subsection (2).

(2) Where judgment on a counterclaim is rendered in favor of the defendant, but he is unable to obtain full recovery in the action because of the inability of the court to render such a judgment and the unavailability of such devices as removal to another court or consolidation with another action in the same court, the defendant is not precluded from subsequently maintaining an action for the balance due on the claim stated in the counterclaim.

controversies between the parties, nor have any effect on the possibility of multiple suits.

We note further that under the trust agreement Chase as trustee appears to have no liability to the trust beneficiaries with respect to the expropriations. Thus, the beneficiaries are the real parties in interest on the railroad equipment counterclaim. Given the absence of any claim against the trust or its beneficiaries, and the absence of any liability of Chase to the beneficiaries, we do not believe that a notion of "fair dealing" such as that which led the Supreme Court in *First National Bank v. Republic of China, supra,* and Justice Douglas in *Citibank I,* to allow assertion of a setoff against a foreign sovereign plaintiff, warrants a relaxation of the "opposing party" requirement.

Finally, we note that if this counterclaim is disallowed and a net judgment is therefore entered in favor of Banco Nacional, the moneys recovered will not be placed in the hands of Banco Nacional, but will be paid into an account controlled by federal authorities. *See* 31 C.F.R. Part 515, *supra.* Upon completion of a negotiated settlement between the governments of the United States and Cuba, the United States Foreign Claims Settlement Commission, which has already been directed by Congress to determine the validity of claims for losses arising from the Cuban expropriations, may be further directed to make compensation awards from a fund consisting of any settlement payments made by Cuba and any moneys accumulated by Cuba or its nationals in blocked accounts in this country prior to the settlement. 22 U.S.C. §§ 1643–43k (1976). Were we to allow the railroad equipment counterclaim here, so that several millions of dollars would go directly to the trust beneficiaries rather than into a claims settlement fund, the result would be to give Chase's customers a preference over other American nationals whose property was likewise expropriated without compensa-

tion. See *Banco Nacional de Cuba v. First National City Bank, supra,* 431 F.2d at 403–04. We decline to relax the rules in order to grant such a preference in a situation where, since there is no Cuban claim against the trust, fairness does not demand it.

The dismissal of Chase's counterclaims as trustee is affirmed.

## IV. COMPENSATION FOR THE EXPROPRIATED BRANCHES

We come finally to question of the damages to which Chase is entitled on its counterclaim for expropriation of its Cuban branches. Judge Brieant, on the premise that Chase was entitled, by analogy to concepts of eminent domain, to full compensation for its loss, awarded Chase a total of $6,904,870, calculated as follows:

| | |
|---|---|
| Capital, net of adjustments | $ 4,370,720 |
| Unremitted Profits | 923,320 |
| Contributions to Retirement and Thrift Incentive Plans | 129,372 |
| Banking Houses and Real Estate Appreciation Over Book Value | 54,858 |
| Premium For Going Concern Value, or "Good Will" | 1,426,600 |
| TOTAL | $ 6,904,870 |

505 F.Supp. at 464. Banco Nacional challenges the validity of the district court's "full compensation" premise, and contends that no award for going concern value should have been allowed.[18] We find merit in Banco Nacional's contention that no premium should have been awarded for going concern value, and this ruling obviates consideration of Chase's contention on its cross appeal that the premium should have been larger.

### A. Standard of Compensation

█ We begin with the recognition that our task in determining the standard of compensation with respect to Chase's expro-

---

18. Banco Nacional also challenges the district court's inclusion and calculation of several items in the capital value of the Chase branches. *See* 505 F.Supp. at 451–59. The district court's findings as to these items are not clearly erroneous and we see no basis for disturbing them.

priation claims is to apply principles of international, not merely local, law. *See Banco Nacional de Cuba v. Sabbatino, supra,* 307 F.2d at 859–60. A review of this area convinces us that there are several strongly espoused views, and that international law is far from clear.

The view long held by the United States is that an alien whose property is expropriated is entitled to "prompt, adequate, and effective" compensation. Described some two decades ago as "the orthodox position," Dawson & Weston, *"Prompt, Adequate and Effective": A Universal Standard of Compensation?,* 30 Fordham L.Rev. 727, 733 (1962), this view has been known as the "Hull Doctrine" since its most celebrated expression in a communication from former United States Secretary of State Cordell Hull to the government of Mexico in 1938 on the subject of the Mexican agrarian takings. Secretary Hull's note stated the position that

> under every rule of law and equity, no government is entitled to expropriate private property, for whatever purpose, without provision for prompt, adequate, and effective payment therefor.

Note of Secretary of State Hull, August 22, 1938, 19 Dept. of State Press Releases No. 465, August 27, 1938 at 140. The term "adequate" has commonly been understood to mean that *full* compensation must be paid. *See* Restatement (Second), Foreign Relations of the United States § 188 (1965) (hereinafter "Restatement"); Murphy, *Limitations upon the Power of a State to Determine the Amount of Compensation Payable to an Alien upon Nationalization,* in III The Valuation of Nationalized Property in International Law 49, 51 (Lillich ed. 1975).

There has been some international support for the Hull Doctrine, see Dawson & Weston, *supra,* at 732–34; Doman, *Postwar Nationalization of Foreign Property in Europe,* 48 Colum.L.Rev. 1125, 1133–38 (1948); Nussbaum, *The Arbitration Between the Lena Goldfields, Ltd. and The Soviet Government,* 36 Corn.L.Q. 31, 41 (1950); *Case Concerning The Factory at Chorzow,* P.C.I.J. Series A—No. 17 at 47–48 (1928). And the view that international law requires full compensation was adopted as recently as 1965 by the Restatement, *supra,* §§ 185–190.

As recognized by the Restatement, however, there have been contrary views, some moderate and some extreme, as to the compensation obligations of expropriating states. *Id.* § 188, Reporter's Note 1. While Dawson & Weston began their discussion from the premise that "[t]he principle of compensation itself is seldom challenged," Dawson & Weston, *supra,* at 727, some nations have taken a position at the very opposite end of the spectrum from the Hull Doctrine, arguing than an expropriating nation need pay the alien no compensation whatever.[19] The Restatement Reporters' Notes observe, for example, that on occasion some Latin American states

> have insisted specifically that international law imposes no duty to pay compensation when property is taken pursuant to a general program of social or economic reform. See, e. g., Mexican Minister of Foreign Affairs to Secretary of State of the United States, August 3, 1938, 3 Hackworth, Digest of International Law, 657 (1942).

Restatement § 185, Reporters' Note 2. And the Supreme Court in *Sabbatino* observed as follows:

> Communist countries, although they have in fact provided a degree of compensation after diplomatic efforts, commonly recognize no obligation on the part of the taking country. Certain representatives of the newly independent and underdeveloped countries have questioned whether rules of state responsibility toward aliens can bind nations that have not consented to them and it is argued that

**19.** One version of this position, known as the Calvo doctrine, based on the writings of the nineteenth century Argentine jurist Carlos Calvo, holds that a state need compensate aliens only to the extent that it would compensate its own nationals. If under a state's laws its nationals are entitled to no compensation for expropriated property, an alien likewise would have no right to compensation. *See* V Hackworth, Digest of Int'l Law § 530 (1943).

the traditionally articulated standards governing expropriation of property reflect "imperialist" interests and are inappropriate to the circumstances of emergent states.

376 U.S. at 429–30, 84 S.Ct. at 940–41 (footnotes omitted).

Intermediate views have been voiced for many years. For example, Sir Hirsch Lauterpacht, while recognizing that a State clearly is bound to respect the property of aliens, suggested a rule of partial compensation for large-scale expropriations:

> [A] State is bound to respect the property of aliens.... [I]n cases in which fundamental changes in the political system and economic structure of the State or far-reaching social reforms entail interference, on a large scale, with private property... [i]t is probable that, consistently with legal principle, such solution must be sought in the granting of partial compensation.

1 L. Oppenheim, International Law § 155, at 352 (8th ed. Lauterpacht 1955). This view apparently was expressed in earlier editions of Oppenheim as well, at least as early as 1948. *See* Dawson & Weston, *supra*, at 735. By 1962, some commentators were suggesting that partial compensation in large-scale nationalizations had "become more the norm than the exception." *Id.* at 738; *id.* at 734–36. *See also* Murphy, *supra*, at 52 n.10: "In negotiating lump sum settlements, the [United States] Department of State has accepted less than full value, and while this fact is reported as a compromise, ... some scholars see such 'compromises' as an acknowledgement of a norm of partial compensation."

Finally, actions taken by the General Assembly of the United Nations on this subject since 1962, while they do not have the force of law, *see* U.N. Charter art. 10, are of considerable interest. In 1962, the General Assembly adopted Resolution 1803 (XVII) entitled Permanent Sovereignty over Natural Resources. Paragraph 4 of this resolution stated a requirement of "appropriate compensation":

> 4. Nationalization, expropriation or requisitioning shall be based on grounds or reasons of public utility, security or the national interest which are recognized as overriding purely individual or private interests, both domestic and foreign. In such cases *the owner shall be paid appropriate compensation, in accordance with the rules in force in the State taking such measures in the exercise of its sovereignty and in accordance with international law.* In any case where the question of compensation gives rise to a controversy, the national jurisdiction of the State taking such measures shall be exhausted. However, upon agreement by sovereign States and other parties concerned, settlement of the dispute should be made through arbitration or international adjudication.

(Emphasis added.) The adoption of Paragraph 4 was preceded by several proposals and counterproposals for its modification. *See generally* Schwebel, *The Story of the U.N.'s Declaration on Permanent Sovereignty over Natural Resources*, 49 A.B.A.J. 463, 465–66 (1963). The United States proposed that Paragraph 4 state "the owner shall be paid appropriate—prompt, adequate and effective—compensation...." In offering this modification, the United States Ambassador stated that it was " 'designed to make explicit what is already implicit in ... operative paragraph 4. In view of the United States the words "appropriate compensation" can only mean prompt, adequate and effective compensation.' " Schwebel, *supra*, at 465. Apparently the Ambassador did not specify that "adequate" meant "full" compensation. Murphy, *supra*, at 52 n.10. The delegate of Madagascar, while supporting the United States's proposal, "characterized the specification of 'prompt, adequate and effective' as 'unnecessary.' " Schwebel, *supra*, at 466. Communist delegates took issue with the United States view, and the principal competing proposal was that of the Soviet bloc, proposing that there be inserted a statement that the General Assembly "Confirms the inalienable right of peoples and nations to the unobstructed execution of nationali-

zation" without an obligation to pay compensation. *Id.* at 465. Eventually, in a spirit of compromise, all proposed modifications, except that of the Soviet bloc, were withdrawn; and the Soviet proposal was voted down. In withdrawing the United States's proposal, the Ambassador stated that his delegation " 'was confident that the expression "appropriate compensation" in operative paragraph 4 of the draft resolution would be interpreted as meaning, under international law, prompt, adequate and effective compensation.' " *Id.* at 466. Resolution 1803 (XVII) was adopted by a vote of 87 in favor and 2 opposed, with 12 abstaining. The United States voted in favor; ten Communist countries, including Cuba, abstained.

Two features, in particular, of Paragraph 4 were heartening to the proponents of "full" compensation. First, it provided that "the owner *shall* be paid" (emphasis added), thus rejecting the view that a state had no obligation to pay compensation. Second, it provided that the compensation was to be paid "in accordance with international law." *See* Schwebel, *supra*, at 466. Nevertheless, the precise intended meaning of "appropriate" remained unclear. *See* Lillich, *Toward a Consensus or More "Rich Chaos"?*, in III The Valuation of Nationalized Property in International Law 183 et seq. (Lillich ed. 1975) (hereinafter *"Consensus or Chaos"*).

In 1973, the General Assembly[20] again spoke on the subject of Permanent Sovereignty over Natural Resources, in Resolution 3171 (XXVIII). The new resolution, while referring in general to Resolution 1803 (XVII), did not itself state a requirement of appropriate compensation. Adopted by a vote of 108 nations, including Cuba, in favor to 1 opposed, with 16 abstentions, including that of the United States, Resolution 3171 (XXVIII) stated that the General Assembly

3. Affirms that the application of the principle of nationalization carried out by States, as an expression of their sovereignty in order to safeguard their natural resources, implies that each State is entitled to determine the amount of possible compensation and the mode of payment, and that any disputes which might arise should be settled in accordance with the national legislation of each State carrying out such measures.

In 1974, at a special session, the General Assembly adopted, without vote, Resolution 3201 (S–VII), entitled Declaration on the Establishment of a New International Economic Order. Paragraph 4(e) looked beyond a state's natural resources, and stated as follows:

Full permanent sovereignty of every State over its natural resources and all economic activities. In order to safeguard these resources, each State is entitled to exercise effective control over them and their exploitation with means suitable to its own situation, including the right to nationalization or transfer of ownership to its nationals, this right being an expression of the full permanent sovereignty of the State. No State may be subjected to economic, political or any other type of coercion to prevent the free and full exercise of this inalienable right;

. . . .

This statement made no mention whatever of Resolution 1803 (XVII) or of any duty to compensate for expropriated property.

Later in 1974, the General Assembly adopted Resolution 3281 (XXIX), which revived the concept of "appropriate compensation," but stated that it "should" be paid rather than it "shall" be paid, and made no reference to international law. Article 2 of Resolution 3281 (XXIX) stated in part as follows:

**20.** In 1972 the UNCTAD (United Nations Conference on Trade and Development) Trade and Development Board passed a resolution also entitled "Permanent Sovereignty over Natural Resources," which read in part as follows:

[S]uch measures of nationalization as States may adopt in order to recover their natural resources are the expression of a sovereign

power in virtue of which it is for each State to fix the amount of compensation and the procedure for these measures, and any dispute which may arise in that connexion falls within the sole jurisdiction of its courts, without prejudice to what is set forth in General Assembly resolution 1803 (XVII). . . .

2. Each State has the right:

. * * * * * *

(c) To nationalize, expropriate or transfer ownership of foreign property, in which case appropriate compensation should be paid by the State adopting such measures, taking into account its relevant laws and regulations and all circumstances that the State considers pertinent. In any case where the question of compensation gives rise to a controversy, it shall be settled under the domestic law of the nationalizing State and by its tribunals, unless it is freely and mutually agreed by all States concerned that other peaceful means be sought on the basis of the sovereign equality of States and in accordance with the principle of free choice of means.

The United States, with thirteen other states, proposed an amendment to Article 2, declaring that each state has the right to "nationalize, expropriate or requisition foreign property for a public purpose, provided that just compensation in light of all relevant circumstances shall be paid." L. Henkin, R. Pugh, O. Schachter & H. Smit, International Law 698 (1980). This amendment was rejected, and the United States voted against Resolution 3281 (XXIX). The final vote was 120, including Cuba, for and 6 against, with 10 abstentions.

This overview of the actions of members of the General Assembly presents at best a confused and confusing picture as to what the consensus may be as to the responsibilities of an expropriating nation to pay "appropriate compensation," and just what that term may mean. The resolutions, the views of commentators, and the positions taken by individual states or blocs are varied, diverse, and not easily reconciled. The reporters for a revision of the Restatement currently in the drafting stage have summed it up well:

> It is difficult . . . to state in black or even gray letter what is the international law now as regards compensation for expropriated alien properties.

Restatement (Second) of Foreign Relations Law of the United States (Revised), Preliminary Draft of Introduction, at xviii (Tent. Draft No. 1, 1980).

The instant case, however, presents fewer difficulties than some we might envision insofar as the selection of a standard of compensation is concerned. We view the range of choices as including principally (1) no compensation, (2) partial compensation, (3) appropriate compensation, and (4) full compensation. We believe that neither of the first two reflects international law, and that in the circumstances of the present case there probably is no difference between the last two.

First, we reject the position espoused by some states that property may be expropriated without an obligation on the part of the nationalizing state to pay any compensation therefor. Whether or not an expropriation violates international law—and we note that the present expropriations have been held unlawful,[21] and that ruling is not here contested—we believe that the prevalent view is the traditional view, to wit, that the failure to pay any compensation to the victim of an expropriation constitutes a violation of international law. *See* 1 Oppenheim, *supra*, § 155 at 352. Further, we regard so much of the General Assembly resolutions as purports to allow expropriating states to determine both the existence and the scope of their duties to compensate aliens as not correctly reflecting international law. *See* Lillich, *Consensus or Chaos, supra*, at 188 n. 17:

> Under generally accepted principles of international law, "[s]uch municipal self-determination of a State's international duties is legally impotent to achieve its purpose." A. Freeman, The International Responsibility of States for Denial of Justice 461 (1938). *See also* Lissitzyn, *The Meaning of the Term Denial of Justice in International Law*, 30 Am.J.Int'l L. 632

21. *See* 505 F.Supp. at 429; *Banco Nacional de Cuba v. First National City Bank, supra,* 478

F.2d at 194, and the authorities there cited.

(1936): "It is hardly necessary to add that a nation cannot escape international responsibility by invoking its own domestic law."

 Nor do we believe that the prevailing view is that international law never requires an expropriating state to pay more than partial compensation. Banco Nacional espouses the partial compensation contention in a way that reveals its unsoundness as a legal standard. It urges that Chase be paid 50% of the value of its branches because most of the past negotiated settlements of expropriation claims have resulted in payments at 40–60% of the value of the claims. The notion that, merely because a negotiated settlement will not result in full payment, a victim of expropriation has no right to more than partial compensation simply confuses adjudication with compromise. Partial compensation inheres in the process of negotiation and compromise; we should no more look to the outcome of such a process to determine the rights and duties of the parties in expropriation matters than we would look to the results of settlements in ordinary tort or contract cases to determine the rules of damages to be applied. Were we to adopt the view pressed by Banco Nacional, either there would be no incentive for an expropriating state to negotiate a settlement, or, more likely, the prospect of a partial compensation award in a court would lead to the negotiation of a settlement at an even lower level. Carrying the process to its logical conclusion, the courts would then be asked to take into account these lower settlements in making the next adjudicated awards. We are concerned with the parties' rights and duties, and we do not believe that international law as to compensation is merely descriptive of their conciliatory actions.

As for the Hull Doctrine and the theory that full compensation is required, we are mindful that it has long been under attack by many commentators as not accurately reflecting international law. Some scholars pressed this view prior to any of the General Assembly resolutions described above. *E. g.*, Dawson & Weston, *supra*, and authorities cited therein. And some consider this view confirmed by the history and language of the U.N. Resolutions. *E. g.*, Lillich, *Consensus or Chaos, supra*. See also Murphy, *supra* at 52: "[i]f adequate compensation is taken to mean an amount equivalent to the full value of the property, it does not reflect the position or practice of a sufficient number of States to constitute a norm of customary international law"; Friedman, *National Courts and the International Legal Order*, 34 Geo. Wash.L.Rev. 443, 454 (1966): "It is nothing short of absurd to pretend that the protestation of the rule of full, prompt, and adequate compensation . . . in all circumstances is representative of contemporary international law."

 It may well be the consensus of nations that full compensation need not be paid "in all circumstances," *id.*, and that requiring an expropriating state to pay "appropriate compensation,"—even considering the lack of precise definition of that term,[22] —would come closest to reflecting what international law requires. But the adoption of an "appropriate compensation" requirement would not exclude the possibility that in some cases full compensation would be appropriate. We see no reason why the two standards may not overlap, and indeed on the facts of the present case we conclude that we need not choose between a standard of full compensation and that of appropriate compensation. Although the award we approve for Chase is less than it seeks and more than Banco

22. Various sets of factors to be considered in determining "appropriate" compensation have been suggested by commentators, including the nature of the enterprise, its origin, its longevity, the rate of return during the life of the enterprise, the presence or absence of an arbitrary or discriminatory quality to the taking, the value of the enterprise to the expropriating state, the value of the enterprise to the alien, and so forth. *See, e. g.*, Lillich, *Consensus or Chaos, supra*, at 197–204; Murphy, *supra* at 61–62 n. 29; Amerasinghe, *The Quantum of Compensation for Nationalized [sic] Property*, III The Valuation of Nationlized Property in International Law 91 et seq. (Lillich ed. 1975).

Nacional would wish, we nevertheless view it as full compensation for Chase's loss, and neither more nor less than is appropriate in the circumstances.

## B. *The Value of the Branches*

█ The principal area of dispute as to the valuation of the Chase branches is whether Chase should receive only their net asset value,[23] or whether it is entitled also to a premium for their value as a going concern. Banco Nacional contends that an award for going concern value is inappropriate. We agree.

The term "going concern value" generally refers to the proposition that the prospective buyer of a business will be willing to pay a premium over the book value of the assets in the expectation that the earnings of the business will continue and that the new owner will receive that stream of earnings. The premium is usually calculated by capitalizing the reasonably expected future earnings over an appropriate period. In support of its contention that it is entitled to receive such a premium to reflect the future earning potential of its Cuban branches, Chase points to, *inter alia*, the Foreign Claims Settlement Commission's ruling that Chase has a valid claim for the going concern value of its Cuban branches:

> [I]n this case the evaluation of the loss should not be limited to the assets of the bank branches, but should also include compensation for the *ever increasing business activities of the branches and the substantial earning potential in connection with such activities.*

In the Matter of the Claim of The Chase Manhattan Bank, N.A. (F.C.S.C. Decision No. CU–6295 Oct. 20, 1971) at 2. (Emphasis added.)

We believe that this view takes insufficient account of the acknowledged state of the Cuban economy following the revolution. As discussed in greater detail in the opinion of the district court and in the authorities cited in the introduction to Part I *supra*, the revolutionary government of Cuba sought to concentrate the means of production in its own hands, and to minimize the role of foreigners in the Cuban economy. Various measures were taken to achieve these goals. In May 1959, for example, an agrarian reform law was enacted, looking toward the nationalization of large land holdings. Thus, in a country whose economy had been founded principally on the production and export of sugar, ownership and control of the sugar production facilities passed to the government. The transaction of other business in Cuba by foreigners and the enjoyment of property rights by foreigners were sharply curtailed. New currency control regulations were imposed and gradually tightened. Alien owners of many of the businesses and members of the professional and propertied classes fled Cuba, leaving much of their property behind. As they fled, ownership and control of their properties became vested in the Cuban government. And last, but no less important, less than one month after the taking of the Chase branches, Law No. 891 decreed that no further banking transactions were to be conducted with private banks.[24]

---

**23.** Obviously Banco Nacional contended that Chase's counterclaim should not be adjudicated at all, and that if adjudicated Chase should recover only 50% of its loss. But despite the statement at the tag end of its brief that Chase's Cuban property "was actually worthless," we do not understand Banco Nacional to contend that Chase is not entitled to some compensation for at least the book value of its Cuban assets.

**24.** Law No. 891 provided in part as follows:
*Whereas:* The creation of money and the assignment of credit should be public functions belonging exclusively to the State, in accordance with the requirements of eco-

nomic planning, and should not be in the care of private enterprises which function under the profit motive and with more care for individual than for collective interests.

\* \* \* \* \* \*

*Article 1.* The function of banking is declared a public function and in the future may only be carried on by the State through Agencies set up for the purpose in conformity with the existing provisions of the law, to the extent that they are not in contradiction with the provisions of the present Law.

For the purposes of the preceding paragraph, it shall be understood that the function of banking includes all the operations

Thus, the circumstances surrounding the taking of the Chase branches were that many of Chase's actual or potential customers had had or were about to have their own businesses nationalized, that many had fled Cuba and been replaced in the ownership of their businesses and properties by the Cuban government, and that Chase's average number of deposits had declined substantially in 1959 and the first eight months of 1960, and that the government soon would decree that those who remained carry on their banking transactions only with government-owned banks. Despite the Foreign Claims Settlement Commission's vision of "ever increasing business" for the Chase branches, and of a "substantial earning potential" we regard the prospects of Chase's Cuban branches in September 1960 for future earnings as highly speculative. Future earnings in this case, therefore, are an inappropriate basis for an award of damages.

We recognize that the Cuban government itself continued to operate the branches as going businesses after the expropriation, but we do not consider it appropriate to make an award on this basis. As the district court noted in awarding Chase less than it requested, the deteriorating condition in Cuba and the government's intentions—short of confiscation—to drive foreign bankers out of Cuba did not violate Chase's rights. *See* 505 F.Supp. at 461. And had Cuba simply exercised its police power to order private banks to cease their banking business and allowed them to use the assets in other enterprises, there would be no justification for awarding Chase the going concern value of its branches. *Cf.*, 1 Nichols, Eminent Domain §§ 1.42[3], 1.42[7] (1980). Given the imminent decree that all banking business must be done with government banking concerns, it would appear that the tangible assets seized provided the Cuban government with virtually all it required.

In short, we see no warrant for believing that, at a time when aliens were fleeing Cuba and many foreign businesses were being abandoned or nationalized, a potential buyer with his eyes open would have paid Chase a premium in anticipation of its future Cuban earnings. This commonsense view is confirmed by the trial testimony of a former executive vice president and comptroller of Chase, who was experienced in bank acquisitions. When asked if, given the political climate in Cuba on August 1, 1960, he would have been willing to purchase a branch of an American bank, he said, "I think it was too far gone by then, you know." We conclude that appropriate compensation to Chase does not include payment for the going concern value of its branches, and that Chase will be fully compensated by an award that excludes any amount reflecting "lost" future earnings. Accordingly the amount awarded Chase by the district court should be reduced by $1,426,600.

## CONCLUSION

We reduce the amount of setoff allowed Chase for expropriation of its Cuban branches from $6,904,870 to $5,478,270, and in all other respects affirm the judgment of the district court. We remand for entry of judgment for Banco Nacional in the amount of $4,315,750, plus such prejudgment interest as may be appropriate. Payment is to be made in accordance with 31 C.F.R. Part 515, to await such disbursement as may be permitted by the appropriate authorities.

---

carried on by banks of deposit and credit, investment and savings, mortgage, promotion and development, and in general all the other operations that may be carried on by banking institutions of any type whatsoever.