CONTINENTAL ILLINOIS CORP., PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 5931-83.     Filed February 28, 1990.
(Iranian Loss Issue).

*Edward C. Rustigan, Joel V. Williamson, Roger J. Jones,*
and *Lloyd S. Fischer,* for the petitioner.
*Cynthia J. Mattson* and *Eli J. Dicker,* for the respondent.

TANNENWALD, *Judge:* Respondent determined the follow-
ing deficiencies in petitioner's Federal income taxes:

| Year | Deficiency |
| --- | --- |
| 1975 | $1,899,880 |
| 1976 | 84,088 |
| 1977 | 36,741,206 |
| 1978 | 15,844,349 |
| 1979 | 3,896,519 |

By order dated April 12, 1989, the "Iranian Loss" issue
was severed from the other issues in the case and is the
subject of this opinion. The issues for decision are whether
petitioner is entitled to deduct losses in 1979 pursuant to
section 165[1] for the expropriation of stock by the Iranian
government in 1979, or alternatively as worthless securities
under section 165(g), both of which issues turn essentially
upon the existence of a reasonable prospect of recovery as
of December 31, 1979. To the extent that we find such
losses deductible in 1979, the parties agree that the losses
should be characterized as section 1231 losses.

[1]All statutory references are to the Internal Revenue Code as amended and in effect for the
year in issue.

This case arises against the backdrop of the political, economic, religious, and cultural chaos stemming from the Iranian revolution and the American hostage crisis that captured the attention of this country from November 4, 1979, to January 20, 1981. In this connection, we note that, if set forth in detail, the chronology of events affecting the issue of reasonable prospect of recovery in respect of the expropriation losses would be unduly lengthy. Such being the case and in view of the fact that there is no disagreement between the parties that the events occurred (as distinguished from the effect to be given to them), we have decided simply to set forth a chronology in terms sufficient to provide the necessary background to our decision. We also note that, in order to avoid repetition, we have reserved some of the facts for inclusion in our opinion.

## FINDINGS OF FACT

Some of the facts are stipulated and are so found. Petitioner is a Delaware corporation which had its corporate headquarters in Chicago, Illinois, at the time it filed its petition herein. Petitioner and its affiliated corporations maintained their books and records and filed their consolidated tax returns on a calendar year basis using the accrual method of accounting. Petitioner filed a timely consolidated Federal income tax return for the taxable year 1979 with the Internal Revenue Service Center, Kansas City, Missouri, on September 5, 1980.

Petitioner's consolidated group included a wholly owned subsidiary, Continental Illinois National Bank & Trust Co. (CINB), a federally chartered national banking association, which wholly owned Continental Illinois Finance Corp. (CIFC), a federally chartered international banking corporation. Through CIFC, petitioner owned stock in two privately owned Iranian banks, Bank Dariush and the Industrial and Mining Development Bank of Iran (IMDBI). It purchased stock in Bank Dariush in 1968, and in IMDBI in 1973. Jafar Akhavan was the principal shareholder and effectively controlled Bank Dariush. The Pahlavi Foundation, a foundation closely associated with the Shah Mohammad Reza Pahlavi (Shah), was the principal shareholder in IMDBI.

During 1978 and 1979, Ayatollah Ruhollah Khomeini (Khomeini) led an Islamic revolution in Iran ousting the Shah, who had ruled Iran as its monarch since 1953, from political power. The Shah fled Iran on January 16, 1979, and Khomeini returned to Iran from exile in France on January 31, 1979. After the new government of Prime Minister Shahpur Bakhtiar failed, Khomeini set up a provisional Islamic government on February 11, 1979, headed by Prime Minister Mehdi Bazargan. A few days later, on February 14, 1979, Marxist guerrillas attacked the U.S. Embassy in Tehran holding more than 100 hostages, including the American Ambassador, for 2 hours until dispersed by Khomeini's forces. Thereafter, the embassy strongly recommended that all Americans leave the country. The Islamic Republic of Iran was proclaimed on April 1, 1979.

Khomeini's revolution espoused fundamental Islamic religious tenets, was violently anti-American, and attempted to rid Iran of Western influence by seizing control of American companies doing business in Iran. Historically, U.S. banks held most of Iran's dollar deposits and were major lenders both individually and as members of syndicates to Iran. In addition to its investments in the two Iranian banks, petitioner and members of its consolidated group held Iranian dollar deposits in the United States and both dollar and nondollar deposits in overseas branches, and had extended both syndicated and nonsyndicated loans to various Iranian entities. The Iranian revolution adversely affected Iranian banking operations, including those of Bank Dariush and IMDBI. Due to the revolution, Akhavan and most of the directors of Bank Dariush had fled Iran in 1978.

On June 7, 1979, the government of Iran nationalized all banks in Iran, including Bank Dariush and IMDBI, pursuant to the Law for the Nationalization of Banks. Although the law did not provide for compensation of shareholders of the nationalized banks, petitioner attempted to secure compensation for its expropriation losses. On June 14, 1979, petitioner sent a letter to the Governor of Bank Markazi, the Central Bank of Iran, offering assistance in the transition of ownership of Bank Dariush and IMDBI. The offer

was rejected. In August 1979, petitioner sent letters to various Iranian government and banking officials demanding compensation for the expropriation of its interests in the two banks, but received no response.

After the nationalization, the Iranian government made conflicting statements regarding whether it would compensate foreign shareholders for expropriations and whether it would honor its international debts. Iranian officials stated publicly during the summer of 1979 that the Iranian government intended to compensate Iranian and foreign investors in banks for the value of their nationalized investments, but made no definitive moves to do so. In November, the Iranian Foreign Minister announced that Iran would not honor foreign debt incurred during the Shah's regime. During 1979, Iran also nationalized foreign insurance companies and other foreign industries.

Despite the attack on the American Embassy in February 1979 and the attacks on American business interests throughout Iran, the United States attempted to maintain diplomatic and economic relations with the revolutionary government in Iran. Such relations were, however, characterized by constant tension which increased dramatically after the Shah arrived in New York, on October 22, 1979, from exile in Mexico to undergo medical treatment. His arrival in the United States provoked a harsh wave of anti-American demonstrations in Iran culminating in a group of militants, supported by Khomeini, seizing the U.S. Embassy in Tehran on November 4, 1979, taking 65 American hostages, and demanding that the United States extradite the Shah. Thereafter, the U.S. State Department again advised all Americans in Iran to leave the country.

Subsequently, Iran refused to release the hostages until the United States: (1) Returned the Shah's assets; (2) ceased interfering in Iranian affairs; and (3) apologized for past U.S. crimes against Iran. The United States responded to the demands by letting Iran know that: (1) American courts were open to Iran to pursue the Shah's wealth; (2) the United States would not interfere internally in Iran; but (3) the United States would not apologize for its so-called crimes.

At the time of the hostage taking, the Iranian political leadership was in disarray. A political power struggle existed between the moderates and the radical clergy, with Khomeini calling for a purge of those not in the mainstream of the Islamic revolution. A few days after the Embassy was seized, Prime Minister Bazargan and his cabinet resigned, and Khomeini gave political power to the Revolutionary Council to manage a transition government until new elections could be held. At about the same time, Khomeini refused to allow American emissaries, former Attorney General Ramsey Clark and William Miller, former Staff Director of the Senate Committee on Intelligence, to enter Iran to discuss release of the hostages. On November 7, 1979, he also forbade Iranian officials to have discussions with any American representatives, a barrier to direct communications with Iran that was maintained throughout the crisis.

In an attempt to pressure the Iranian government to release the hostages, President Carter ordered a prohibition on oil imports from Iran on November 12, 1979. On November 14, 1979, when Iran indicated its intention to withdraw its deposits from U.S. financial institutions, President Carter, by executive order, froze all property and property interests of the government of Iran, its instrumentalities and controlled entities, and the Central Bank of Iran in U.S. banks and their foreign branches. Iran closed its airspace to U.S. aircraft and the United States halted shipment of all military equipment to Iran and virtually ceased all trade with Iran on November 14, 1979. The executive order implementing the freeze provided:

### BLOCKING IRANIAN GOVERNMENT PROPERTY

Pursuant to the authority vested in me as President by the Constitution and laws of the United States including the International Emergency Economic Powers Act, 50 U.S.C.A. sec. 1701 *et seq.*, the National Emergencies Act, 50 U.S.C. sec. 1601 *et seq.*, and 3 U.S.C. sec. 301,

I, Jimmy Carter, President of the United States, find that the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and hereby declare a national emergency to deal with that threat.

I hereby order blocked all property and interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to the jurisdiction of

the United States or which are in or come within the possession or control of persons subject to the jurisdiction of the United States.

The Secretary of the Treasury is authorized to employ all powers granted to me by the International Emergency Economic Powers Act to carry out the provisions of this order.

This order is effective immediately and shall be transmitted to the Congress and published in the *Federal Register.*

/s/ Jimmy Carter

## Executive Order 12170 of Nov. 14, 1979, 44 Fed. Reg. 65729 (Nov. 15, 1979).

### The White House announcement of the President's action stated:

The President has today acted to block all official Iranian assets in the United States, including deposits in United States banks and their foreign branches and subsidiaries. This order is in response to reports that the Government of Iran is about to withdraw its funds. The purpose of this order is to ensure that claims on Iran by the United States and its citizens are provided for in an orderly manner.

The order does not affect accounts of persons other than the Government of Iran, the Central Bank of Iran, and other controlled entities. The precise amounts involved cannot be ascertained at this time, but there is no reason for disturbance in the foreign exchange or other markets.

The President is taking this action pursuant to the International Emergency Economic Powers Act, which grants the President authority "to deal with any unusual and extraordinary threat to the national security, foreign policy, or economy, of the United States." [15 Presidential Documents (Part 2) 2117 (Nov. 14, 1979).]

### The President's message notifying Congress of the freeze stated:

TO THE CONGRESS OF THE UNITED STATES:

Pursuant to Section 204(b) of the International Emergency Economic Powers Act, 50 U.S.C.A. sec. 1703, I hereby report to the Congress that I have today exercised the authority granted by this Act to block certain property or interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran.

1. The circumstances necessitating the exercise of this authority are the recent events in Iran and the recent actions of the Government of Iran.

2. These events and actions put at grave risk the personal safety of United States citizens and the lawful claims of United States citizens and entities against the Government of Iran and constitute an extraordinary threat to the national security and foreign policy of the United States.

3. Consequently, I have ordered blocked all property and interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to the jurisdiction of the United States or which are or come within the possession of persons subject to the jurisdiction of the United States. I have authorized the Secretary of the Treasury to employ all powers granted to me by the International Emergency Economic Powers Act to carry out the blocking.

4. Blocking property and property interests of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran will enable the United States to assure that these resources will be available to satisfy lawful claims of citizens and entities of the United States against the Government of Iran.

5. This action is taken with respect to Iran for the reasons described in this report.

/s/ Jimmy Carter

15 Presidential Documents (Part 2) 2118 (Nov. 14, 1979).

In briefing the press on November 14, 1979, the Secretary of the Treasury, G. William Miller, reiterated the economic purposes underlying the freeze order and pointed out that the claims of U.S. nationals were intended to include "possible claims for property that has been taken by the Iranian government." Also on that day, the Treasury Department issued regulations implementing the freeze. The regulations prohibited any attachment, judgment, lien, or execution against Iranian property unless licensed by the Treasury. In addition, the regulations specifically provided that no license or authorization should be deemed to authorize any transaction to the extent that it was prohibited by any law or statute.

In November and December 1979, the Treasury licensed prejudgment attachments against Iranian property subject to the freeze, but the regulations still prohibited the entry of any judgment and execution against such property. On November 16, 1979, the regulations licensed foreign branches and subsidiaries of U.S. firms and domestic banks to set off their claims against Iran or Iranian entities by debit to the blocked deposits held by them abroad for Iran or Iranian entities. Subsequently, Treasury amended the regulations to unblock nondollar deposits held abroad by U.S. firms and banks. Shortly thereafter, Treasury ruled that the freeze did not bar moving claims against Iran to overseas offices. In taking these actions, the Treasury did

not rule on the validity of any setoff. The President retained the power to amend, modify, or revoke any license or authorization, including the attachments and setoffs.

Following promulgation of the Treasury regulations, many U.S. claimants filed lawsuits against Iran and various of its instrumentalities and obtained prejudgment attachments against the frozen Iranian assets. Beginning in early 1980, the U.S. Government urged American courts to stay the lawsuits pending resolution of the hostage crisis. Overseas branches and subsidiaries of U.S. banks also set off on their books liquidated loan claims against the deposits of Iranian firms and banks before the end of 1979.

In November and December 1979, Bank Markazi filed suit in London, France, and Germany against five U.S. banks that were refusing its demands for release of Iranian dollar deposits held in their overseas branches, challenging the legality of the freeze order as it applied to offshore Iranian assets and the legality of setoffs. In turn, the U.S. banks, on the basis that their overseas setoffs might not be entirely upheld, sued Iran for unpaid loans and attached Iranian assets in the United States and Europe, principally in Germany, where Iran had substantial capital investments. No court reached a final decision in any of these cases.

On November 28, 1979, petitioner estimated that its consolidated group, including its overseas subsidiaries, held over $90 million of Bank Markazi assets, comprised of:

(1) $10,588,899 (Chicago dollar demand account),
(2) $50,000,000 (London dollar time deposit),
(3) $3,500,000 (Nassau dollar time deposit),
(4) $17,072,000 (London time deposit of 30 million deutschmarks due 12/31/79),
(5) $12,662,000 (London time deposit of 20 million Swiss francs due 3/31/80).

After the freeze, petitioner calculated CIFC's total expropriation claims against the government of Iran for Bank Dariush and IMDBI at book value, as of March 20, 1978, of approximately $7.7 million.

On December 24, 1979, the Iranian government announced the merger of Bank Dariush and IMDBI with other

nationalized banks to form the Bank Mellat (Bank of the Nation) and the Bank for Industry. The announcement of the mergers made no reference to compensation of shareholders in the merged entities. Beginning with the nationalizations of Bank Dariush and IMDBI, petitioner had explored its potential remedies to recover compensation from Iran, including corresponding with Iranian officials. See pp. 167-168, *supra.* Petitioner's Country Exposure Committee monitored the risks of investing in Iran from 1979 to 1985. By December 1979, petitioner downgraded its evaluation of Iran in terms of investment potential because of the attendant political and economic risks. By April 1981, the Committee had downgraded Iran to the highest risk categories both economically and politically. Petitioner consulted with its law department and outside counsel in the United States and the United Kingdom in reviewing all of the possible options for recovery on its claims.

On December 31, 1979, CIFC assigned to CINB all its interest in the claims against Iran for expropriation of the stock of Bank Dariush and IMDBI and its receivable for an outstanding unpaid dividend declared by Bank Dariush for a total of $8,456,153. This total was comprised of the book values of Bank Dariush and IMDBI as of March 20, 1978, and the unpaid dividend. Petitioner assigned CIFC's expropriation claims to CINB to consolidate the Iranian claims with the deposits in one location within petitioner's corporate structure, i.e., its Chicago office, so as to facilitate the possibility of a setoff in the event the freeze was lifted. Although CIFC had created an unallocated reserve of $5,260,000 for investment losses on its books at the close of 1979, neither CIFC nor CINB had allocated, at that time, any specific amount to a reserve for the expropriation losses nor taken any losses on its books for the losses.

At the end of 1979, no forum existed in which petitioner could bring an expropriation claim against Iran either in the United States, Iran, or any other jurisdiction. Unlike the commercial claims for which U.S. claimants could obtain valid prejudgment attachments under the Treasury regulations because Iran's sovereign immunity for such claims had been waived under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. secs. 1602-1611 (1982), and the

bilateral Treaty of Amity, Economic Relations, and Consular Rights with Iran (1955), 8 U.S.T. 899, T.I.A.S. 3853, petitioner was prevented from obtaining a valid prejudgment attachment or suing in the United States on its expropriation claims by Iran's ability to rely on its sovereign immunity and on the "act of state" doctrine.[2] Recourse in Iranian courts was also impossible.

The freeze foreclosed petitioner from setting off its expropriation claims against Iranian deposits held by petitioner in the United States. In addition, petitioner was advised by counsel, including its English counsel, that there was only a remote possibility of setoff against the accounts of Bank Markazi in petitioner's London branch (see pp. 186-187, *infra*), although the nondollar overseas deposits were not frozen and the Treasury regulations licensed foreign branches of U.S. banks to set off claims against their blocked overseas Iranian dollar deposits.

Throughout the hostage crisis the United States had two overriding policy objectives: (1) The protection of the well-being of the hostages and their safe release at the earliest possible moment, and (2) the protection of the honor and vital national interests of the United States. Although the articulated purpose of the freeze was economic—to prevent a perceived harm to the U.S. economy that would be caused by the withdrawal of Iranian deposits and to protect U.S. claimants—the Administration's primary concern was possession of a bargaining chip to force negotiations for the return of the American hostages.

Throughout 1979 and well into 1980, Iran was in a state of political chaos and lacked an organized leadership with the power or ability to negotiate the release of the hostages or a settlement of claims. On November 17, 1979, Khomeini directed the militants to release the women and black hostages, but this positive development was countered by the threats of Iranian officials that the remaining hostages would be tried for espionage. Although the Shah left the United States for Panama on December 15, 1979, Iran still refused to discuss release of the hostages. Iran also refused

---

[2] For an explanation of the elements of sovereign immunity and the "act of state" doctrine, see *Halliburton Co. v. Commissioner*, 93 T.C. 758, 771 notes 4 and 5 (1989). See also *W. S. Kirkpatrick Co. v. Environmental Tectronics Corp. International*, 493 U.S. ___ (1990).

to recognize a United Nations Security Council resolution, adopted in December 1979, calling for the immediate release of the American hostages and refused to comply with an International Court of Justice order, issued in late 1979, to release the hostages. The Soviet Union's invasion of Afghanistan on December 27, 1979, created additional tensions by threatening Iranian sovereignty and further complicating efforts to involve the international community in obtaining the hostages' release.

After the hostages were seized, United Nations Secretary-General Kurt Waldheim attempted to negotiate their release with various Iranian officials. By November 17, 1979, the United States worked out a four-point statement of its position that Waldheim conveyed to Iranian authorities. On December 31, 1979, Waldheim visited Iran on a mediation mission carrying the following elaboration of that position:

1. All U.S. personnel held hostage must be released from Iran prior to the institution of any international tribunal.

2. The United States was prepared to work out in advance a firm understanding on arrangements for the airing of Iranian grievances before an appropriate forum after the hostages had been released.

3. The United States would not object to any Iranian suits in U.S. courts to recover assets allegedly taken illegally from Iran by the former Shah.

4. The United States would affirm jointly with Iran its intention to abide by the Declaration on Principles of International Law Concerning Friendly Relations and Cooperation Among States in Accordance with the Charter of the United Nations and by the provisions of the Vienna Convention on Diplomatic Relations. The United States stated that it accepted the present government of Iran as the legitimate authority in Iran and reaffirmed the view that the people of Iran had the right to determine their own form of government.

5. The United States was willing, once the hostages were safely released, to seek, in accordance with the UN Charter, a resolution of all issues between the United States and Iran.

Upon his arrival in Tehran, Waldheim encountered large and hostile demonstrations against the United Nations and the United States. Although Waldheim met with Iranian leaders during the first week of January 1980, his mission to stimulate negotiations for the release of the hostages was totally unsuccessful. After Waldheim returned from Iran, the United States prepared a more complete statement of the U.S. position in an effort to convince the Iranians that

the United States was willing to agree to a mutually honorable end to the crisis. On January 13, 1980, the United States passed to Waldheim a six-point elaboration of the U.S. position that contained the following explanation of the U.S. position with respect to U.S. claimants:

Once the hostages are safely released, the United States is prepared to lift the freeze of Iranian assets and to facilitate normal commercial relations between the two countries, on the understanding that Iran will meet its financial obligations to U.S. nationals and that the arrangements to be worked out will protect the legitimate interests of U.S. banks and other claimants. The United States is prepared to appoint members of a working group to reach agreement on those arrangements.

The proposal was transmitted to Iranian leaders but drew no response.

Shortly after the failed Waldheim mission, moves to establish a United Nations commission of inquiry to address Iranian grievances against the United States failed, as did the United Nations Security Council resolution for economic sanctions against Iran because of the Soviet Union's veto. The United States, nonetheless, indicated its intention to impose sanctions on Iran and urged its allies to do the same.

In the spring of 1980 when it was clear that Iran's internal power struggle was preventing an end to the crisis, President Carter increased the pressure on Iran to negotiate. In April 1980, he formally broke diplomatic relations with Iran, imposed additional economic sanctions on Iran, and launched a failed military rescue mission to free the hostages. The European communities and Japan also imposed economic sanctions on Iran in May 1980.

After imposition of the freeze, petitioner faced the likelihood that Bank Markazi would demand the payment of its deposits in London and would institute legal proceedings if payment was not made. In fact, on March 27, 1980, Bank Markazi demanded payment of its 20 million Swiss franc deposit maturing on March 31, 1980. In response, CINB requested compensation for its expropriation claims prior to remitting the funds or, as an alternative, suggested that Bank Markazi renew the deposit pending resolution of the expropriation issues. Bank Markazi did not make any further efforts to withdraw its funds.

During the summer of 1980, the Iranian government enacted two laws, the Law on Authorization to Fund Capital for the Continuity of Operation of Nationalized Banks and Credit Institutions and the Bill Concerning the Protection of Minority Iranian Shareholders of Nationalized Banks and Credit Institutions, to provide compensation for minority Iranian shareholders in nationalized banks. Pursuant to the laws, shareholder compensation was based on financial statements, to be prepared by the government for each nationalized bank, as follows: (1) Minority Iranian shareholders of the nationalized banks were to be compensated for the par value of their bank stock; (2) the remaining Iranian shareholders were to receive nothing; and (3) foreign shareholders were to be compensated based on net book value. Petitioner received no compensation for its expropriation claims pursuant to the laws.

From November 1979 to the fall of 1980, Iran made virtually no move to discuss the hostage issue, although the Shah had died in Egypt in July 1980. During that time, the only communications between the United States and Iran had been unofficial discussions through private channels, including the U.S. banks holding frozen Iranian assets. In May 1980, the so-called "bankers' channel" secretly began negotiating with representatives of Bank Markazi to resolve U.S. bank claims. The bankers acted within guidelines set by the U.S. Government to ensure consistency with U.S. policy, kept the U.S. Government informed of their negotiations, and informed Bank Markazi that release of the hostages was a requisite condition to any financial settlement.

In June 1980, Bank Markazi privately and publicly asserted that Iran was prepared to arbitrate all claims, without offering specifics. By June 1980, the "bankers' channel" had developed what was known as Plan C which provided for release of the hostages, payment of liquidated debts from overseas assets, release of frozen assets, and the settlement of U.S. claims. All of the bankers' channel plans involved using frozen foreign deposits held by U.S. banks to pay liquidated loan claims and establishing a structure to satisfy unliquidated claims out of the net overseas balances and frozen assets in the United States. Petitioner was

unaware of the bankers' channel until it was included in the negotiations in late November and early December 1980.

By mid-August 1980, after months of internal political struggle, Iran had a new Parliament and Prime Minister. The catalyst for negotiations between Iran and United States occurred in September 1980 when Khomeini advanced the following four conditions which the United States would have to meet to obtain the release of the hostages: (1) Pledge that it would not intervene in the internal affairs of Iran, (2) return all of the frozen Iranian assets to Iran, (3) cancel all U.S. claims against Iran, and (4) return the wealth of the Shah of Iran.

Shortly thereafter, the United States and Iran began conducting negotiations through intermediaries, which were interrupted by the start of the Iran-Iraq war on September 22, 1980. The combination of Iran's diplomatic isolation, an economy severely strained by sanctions, the drawdown of financial reserves which were not replenished because of much-reduced oil sales, and the general unavailability of military resupply spurred Iran's willingness to negotiate the release of the hostages. The pendency of the American presidential campaign during the period November 1979 to November 1980 and the impending change in Administration and negotiating strategies due to take place on January 20, 1981, were also background factors in Iran's decision to resolve the hostage crisis. Negotiations between the United States and Iran resumed in November 1980 after the Iranian Parliament formally approved the four conditions for release of the hostages advanced by Khomeini.

In November 1980, the United States officially responded to Iran's four conditions by stating that it would: (1) Agree to nonintervention; (2) return approximately $5.5 billion of frozen Iranian assets, but not release the remainder until something was done about Iran's borrowings from U.S. banks and the judicial attachments previously obtained by U.S. claimants; (3) bring about the cancellation of claims provided Iran agreed to allow claimants to submit claims to an international arbitral tribunal and to pay awards made by the tribunal; and (4) facilitate litigation for the return of the Shah's assets. From November 1980 through January 1981, official negotiations with Iran paralleled and later

were coordinated with the bankers' channel negotiations. By this time, the U.S. Government realized that a consensual bank settlement was necessary to avoid a bank challenge that could prolong negotiations and the release of the hostages.

As a result of negotiations between the two countries, on January 19, 1981, the United States and Iran reached an agreement for the release of the hostages known as the "Algiers Accords." Under the terms of the Accords, the hostages were released and flown to West Germany on January 20, 1981. Their claims against Iran were barred by the Accords. Iran agreed to pay outstanding U.S. bank loans in full, and the United States agreed to return the frozen assets to Iran under the terms of the Accords. The Algiers Accords and the related Executive Orders implementing them also terminated all legal proceedings in U.S. courts involving claims against Iran, revoked the attachments against Iran's property and the setoffs by foreign branches and subsidiaries of U.S. companies, including the banks, and established the Iran-United States Claims Tribunal at the Hague to resolve claims through binding international arbitration rather than in U.S. courts.

The Accords created the following three dedicated escrow accounts to fund settlement of claims between U.S. claimants and Iran and required U.S. banks to pay their frozen Iranian deposits into the accounts: (1) Account Number 1 was an escrow account in the Federal Reserve Bank of New York dedicated to the payment of syndicated bank debt extended to Iran; (2) Account Number 2 was a $1.4 billion escrow account in the Bank of England dedicated to the payment of claims relating to nonsyndicated bank debt; and (3) Account Number 3 (the $1 billion security account of frozen assets which Iran agreed to replenish if the account fell below $500 million) was dedicated to the payment of American commercial and expropriation claims to be resolved by submission to the Hague Tribunal. During final bankers' channel negotiations, the Treasury Department rejected petitioner's request to have its expropriation claims payable from Account Number 2, rather than resorting to Hague arbitration and Account Number 3. The Supreme Court upheld the Algiers Accords and the President's power

to vacate attachments and setoffs and suspend litigation against Iran in *Dames & Moore v. Regan,* 453 U.S. 654 (1981).

In November 1979, the Treasury Department had estimated that the amount of frozen Iranian assets totaled $8 billion. In the spring of 1980, the Treasury Department took the first census of U.S. claims against Iran and determined the frozen assets amounted to between $11 and $12 billion. In 1982, the Treasury Department estimated that Claims Tribunal awards in favor of U.S. claimants would exceed $4 billion.

In January 1982, petitioner filed a claim with the Hague Claims Tribunal seeking damages from Iran of approximately $8.9 million (based on Tehran stock exchange values in February 1979) for the expropriation of its stock interests in Bank Dariush and IMDBI. Petitioner was granted a stay of the Hague proceedings in order to conduct direct negotiations with Iran. In April 1983, petitioner began direct negotiations with Iran to settle all its claims, including outstanding loans, interest due on accounts, and the expropriation claims. In 1985, petitioner finally settled its claims against Iran for a net $3.32 million ($5.32 million to be paid by Iran to petitioner from Account Number 2 and $2 million to be paid by petitioner to Iran). In a memorandum of settlement entered on April 11, 1985, the parties agreed that the settlement was reached without agreeing upon any particular values for any specific categories of claims, including the expropriation claims. Iran also required petitioner to sign a side letter agreement recognizing that no part of the compensation petitioner received was for the petitioner's equity interests in Bank Dariush or IMDBI (the equity side letter).

On its consolidated Federal income tax return for 1979, petitioner deducted a long-term capital loss of $7,156,010, consisting of $6,669,819 for its expropriated stock in Bank Dariush and $486,191 for IMDBI. Respondent disallowed the losses.

## OPINION

Section 165(a) provides that, as a general rule, a deduction shall be allowed for "any loss sustained during the

taxable year and not compensated for by insurance or otherwise." A loss is not sustained during a taxable year if "a claim for reimbursement of a loss" exists "with respect to which there is a reasonable prospect of recovery"; deductibility is postponed until it is determined with "reasonable certainty" whether or not such reimbursement will be received and its amount. Sec. 1.165-1(d)(2)(i), Income Tax Regs.[3] The parties are in agreement as to the amount of petitioner's claimed losses in respect of the stock in Bank Dariush and in IMDBI and that, at least for the purpose of determining whether the loss occurred by virtue of expropriation by Iran, the stock was expropriated in 1979. The issue to be decided is whether petitioner sustained losses from the expropriations deductible in 1979. The issue is one of fact and the burden of proof is on petitioner. *Korn v. Commissioner*, 524 F.2d 888, 890 (9th Cir. 1975), affg. a Memorandum Opinion of this Court; *Estate of Fuchs v. Commissioner*, 413 F.2d 503, 507 (2d Cir. 1969), affg. a Memorandum Opinion of this Court.

Insofar as the issue involves the existence and enforceability of petitioner's claims against Iran in respect of the expropriation (other than through the possibility of setoff, see pp. 184-188, *infra*) and whether there was a reasonable prospect of recovery on those claims by virtue of the actions of the U.S. government (particularly the "freeze order" of November 14, 1979), this case is controlled by our opinion in *Halliburton Co. v. Commissioner*, 93 T.C. 758 (1989). We see no reason to repeat the analysis articulated in that opinion.

Here, as in *Halliburton*, respondent seeks to capitalize on the efforts, which petitioner made through its officers and attorneys, to follow and even participate in the course of events in order to preserve the viability of its possible right to be compensated by Iran for its expropriation claims. We consider irrelevant the fact that the record herein contains

---

[3]Sec. 1.165-1(d)(2)(i), Income Tax Regs., in pertinent part, reads:

(2)(i) If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be receive is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances. * * *

more information as to petitioner's efforts to be compensated for its claims than did the record in *Halliburton* as to that taxpayer's efforts. The relevant question is the weight to be given to those efforts in determining whether a reasonable prospect of recovery existed as of December 31, 1979. As we observed in respect of comparable efforts of the taxpayer in *Halliburton,* petitioner's efforts represent no more than actions which any reasonable businessman would be expected to take to be in a position to realize a recovery if the possibility, however remote, later developed. These efforts can be said to be consistent with, and in furtherance of, a hope but not, under the circumstances herein, a reasonable expectation of recovery. We again emphasize, as we did in *Halliburton,* that the cases which look askance at such efforts involved situations where a present legal remedy and forum for enforcing such remedy existed, a situation which does not obtain herein. See cases cited and discussed in *Halliburton Co. v. Commissioner, supra* at 775.

Nor do we attach the same significance that respondent does to petitioner's decision to assign CIFC's expropriation claims to CINB (see p. 173, *supra*). The assignment represents no more than the placing of the expropriation claims in the hands of the same corporate entity which held U.S. deposits of the Bank Markazi in order to be in a better position to assert a right of setoff to the extent that such a right may have existed once the freeze order was lifted. See pp. 184-188, *infra.* Additionally, in light of the entire record indicating the absence of a reasonable prospect of recovery at the end of 1979, we accord little weight to the essentially subjective element reflected by the fact that petitioner failed to create specific reserves or take book losses for its expropriation claims during 1979. See *Boehm v. Commissioner,* 326 U.S. 287, 292-293 (1945).

In a similar vein, we disagree with respondent that petitioner's continued insistence that it was entitled to full and fair market value compensation for its claims under international law and the Treaty of Amity with Iran created a reasonable prospect of recovery. Such insistence could bear fruit only if there was a reasonable prospect that the claims would be recognized and validated, which was far from the situation at the end of 1979. Additionally, in the

context of evaluating petitioner's efforts, we also do not share respondent's view that petitioner's attempt in late 1980 to have its expropriation claims made eligible for payment out of Account Number 2 is indicative of the existence of a reasonable prospect of recovery. Not only did this attempt occur substantially later than the end of 1979, but in point of fact it failed; the fact that it was made is, if anything, evidence that there was doubt that payment of petitioner's claim would have been obtainable from Account Number 3 to which remedy petitioner would otherwise be remitted. Finally, despite respondent's emphasis on the significance of the census of U.S. claims taken in the spring of 1980, we are satisfied that the census was nothing more than what its nomenclature denotes—a post-1979 accounting of the claims and assets available to satisfy them if and when negotiations with Iran began at some indeterminate future date.

There are two elements in the present case, not present in *Halliburton,* which require consideration. The first element is the impact of the bankers' channel. Respondent argues that the activities of the bankers in seeking to secure a financial settlement to coincide with release of the hostages was a significant element in enhancing petitioner's prospects of recovery in respect of its expropriation claims. We disagree for several reasons:

(a) The bankers' channel did not commence its activities until May of 1980. To be sure, there were elements of the situation at the end of 1979 (the freeze and the subsequent lawsuits, attachments, and setoffs, relating in large part to the protection of banks having liquidated loan claims) which indicated that the bankers would have to be parties to any settlement negotiations. These elements, however, fall far short of establishing a reasonable prospect of recovery on the part of petitioner for its expropriation claims. In this connection, we also note that petitioner's knowledge and participation in the bankers' channel did not begin until late November 1980.

(b) It is clear that the activities through the bankers' channel were at all times primarily directed toward the disposition of the claims of the banks for repayment of bank loans and that the settlement of other types of claims

was of secondary importance. The most that could be anticipated was that, at some point in time after the problems of the loans were disposed of, attention would then be directed to the disposition of the other claims utilizing the balance of the frozen assets, if any.

(c) The efforts of the bankers were subject to a variety of pitfalls. The events of 1980, at least as far as the bankers' channel is concerned, constitute a saga of uncertainty and frustration which can hardly have generated any confidence that a reasonable prospect of recovery in respect of expropriation claims could be said to have existed at the end of 1979. On several occasions, in November and December 1980 and January of 1981, Iran rejected settlement plans that had been developed and made additional demands.

The second element, not present in *Halliburton,* arises from the fact that petitioner held more than a sufficient amount of Bank Markazi deposits to cover its expropriation claims as well as its loan claims. On this basis, respondent argues that petitioner's potential setoff of those deposits against its claims provides the foundation for our holding that petitioner had a reasonable prospect of recovery on its claims when the freeze was lifted. We think that the facts of the situation do not reach as far as respondent wishes us to go. There are several factors that support this conclusion:

(a) Clearly, petitioner had no right of setoff against Iranian deposits in the United States as long as the freeze order remained in effect. However, even without the freeze order, petitioner would have encountered considerable difficulty in asserting any setoff on account of its expropriation claims. Any affirmative action by petitioner to enforce a setoff would have been precluded by the "act of state" doctrine and the defense of sovereign immunity. *Alberti v. Empresa Nicaraguense de la Carne,* 705 F.2d 250 (7th Cir. 1983). Thus, a mere lifting of the freeze order would not have improved petitioner's position in this respect unless it were accompanied by some arrangement for the settlement of petitioner's expropriation claims—an arrangement which in fact materialized in the Algiers Accords, but which we refused, in *Halliburton Co. v. Commissioner, supra,* to

equate with the existence of a reasonable prospect of recovery at the end of 1979.

We are not unmindful of the fact that the freeze order prohibited any payment of the U.S. deposits and thus protected petitioner against any demand for payment. From this, it can be argued that petitioner was in a position to wait out the freeze and, when it was lifted, refuse payment. By this means, so the argument goes, petitioner could force the Bank Markazi to bring suit to require payment and thus enable petitioner to assert a setoff pursuant to the holding of the Supreme Court in *Nat. City Bank v. Republic of China*, 348 U.S. 356 (1955). See also *First Nat. City Bank v. Banco Para El Comercio*, 462 U.S. 611, 613 (1983); *First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 762 (1972). But the scope of the setoff exception to the general rule in respect of the availability of the "act of state" defense is far from clear. See *Banco Nacional de Cuba v. Chase Manhattan Bank*, 658 F.2d 875, 881-885 (2d Cir. 1981); *Bank Tejarat v. Varsho-Saz*, 723 F. Supp. 516, 518-521 (C.D. Cal. 1989).[4]

We also note that the availability of a right of setoff in an action by Bank Markazi to force payment of its U.S. deposits would also have involved the question of the extent to which the Bank Markazi and the government of Iran would be considered sufficiently identified with each other to permit the expropriation claims to be asserted by way of setoff; although such identification would probably have been made, it would not have been an inevitable result. See *First Nat. City Bank v. Banco Para El Comercio*, 462 U.S. at 633 ("Our decision today announces no mechanical formula for determining the circumstances under which the normally separate juridical status of a government instrumentality is to be disregarded."); *Banco Nacional de Cuba v. Chemical Bank*, 782 F.2d 377, 379-380 (2d Cir. 1986). Additionally, we emphasize that the possibility of a lawsuit before December 31, 1979, by Bank Markazi in

---

[4]The same lack of clarity exists with respect to the application of the so-called Hickenlooper Amendments, 22 U.S.C. sec. 2370(e)(2) (1988), which erected certain barriers to the assertion of a defense based on the "act of state" doctrine. See *Banco Nacional de Cuba v. Chase Manhattan Bank*, 658 F.2d 875, 882 n.10 (2d Cir. 1981); *Bank Tejarat v. VarshoSaz*, 723 F. Supp. 516, 520 (C.D. Cal. 1989). In any event, neither party has argued that the Hickenlooper Amendments have any bearing on the instant case.

which a setoff for petitioner's expropriation claims might have been asserted simply did not exist and respondent has not argued that it did.

. Finally, it is important to keep in mind that, at the end of 1979, any settlement (which respondent so confidently insists would eventuate but we have concluded was at best speculative) could have diluted petitioner's right of setoff by requiring that the U.S. deposits (and possibly dollar deposits abroad) be utilized for the purpose of settling claims of other U.S. claimants as well as those of petitioner—an eventuality which in fact occurred under the Algiers Accords. Cf. *Republic Nat. Bank of New York v. Sabet*, 512 F. Supp. 416, 427 (S.D.N.Y. 1980), affd. without published opinion 681 F.2d 802 (2d Cir. 1981).

·. (b) As far as Bank Markazi's accounts in petitioner's London branch are concerned, while the accounts were either subject to a licensed setoff (dollar deposits) or were not subject to the freeze order (deutschmark and Swiss franc deposits), we are satisfied that petitioner could not have legally effected a setoff (under the laws of England which would have applied) and that any attempt to do so, would have exposed it to substantial claims for damages, costs, and perhaps even revocation of its charter. Several difficulties were present in effecting such a setoff. Among these elements were:

(1) The need for the offsetting claim to be in a liquidated amount, which the expropriation claims were not.

(2) The need that the offsetting transactions be between the same parties. The assignment to CINB at the end of 1979, while perhaps helpful in a U.S. setting, would appear to have complicated this problem because it separated the entity holding the London bank deposits from the purported owner of the expropriation claims. Additionally, there was the question as to whether, under English law, Bank Markazi and the government of Iran could be treated as the same person so as to allow petitioner to set off its expropriation claim against the government of Iran by using the deposits of Bank Markazi. See *First Nat. City Bank v. Banco Para el Comercio*, 462 U.S. at 626 n. 18.

(3) Only debts currently due and payable could be set off.

(4) The debits and credits of the setoff had to be in the same currency.

(5) Any setoff which was licensed pursuant to the regulations under the freeze order was subject to revocation by the U.S. Treasury Department under the same regulations. Indeed this is what occurred under the Algiers Accords, albeit that such action was in the context of the establishment of a procedure for the settlement of claims.

(6) We accord only peripheral significance to the fact that petitioner was able to discourage the Bank Markazi from withdrawing its Swiss franc account in petitioner's London branch in March of 1980. Such action represents no more than a postponement of resolution of the issue of compensation for the expropriation claims without in any way determining whether a setoff would have been legally possible.

While the foregoing analysis is primarily in the context of the right of petitioner under English law to take unilateral action by way of setoff, we have no reason to conclude that its position would have been significantly different if asserted as a defense in a legal action brought by the Bank Markazi in England. We are satisfied that, at the very least, petitioner's position in such event of legal action against it would not have been any less complicated than the position we have previously outlined in respect of litigation in the United States if the freeze order had been lifted. In this connection, we note that the Bank Markazi did not institute legal action against petitioner when the latter refused to pay deposits held by its London branch and that the litigation involving other U.S. banks (see *supra* p. 172) was never definitively resolved.

We see no need further to refine petitioner's capacity to set off its expropriation claims because respondent does not seriously contend that the advice of petitioner's lawyers that it had no legal right to set off those claims against the Iranian bank deposits either in the United States or in London was incorrect. Rather he contends that such advice and the above listed elements upon which it was based should not be given significant weight because the lawyers' ultimate advice was to assert a right of setoff both in contemplation of and in the eventuality of the freeze being

lifted. Again, we think respondent pushes his position too far. Essentially respondent is asserting that we should apply the adage "Possession is eleven points in the law." C. Cibber, Woman's Wit act I (1697). This we are not prepared to do, at least under the circumstances involved herein. Rather, we see the appropriate standard in respect of the right of setoff as whether there existed a reasonable possibility of success in the event of litigation. In sum, we think that the threat of setoff was no more than an uncertain bargaining chip and should be accorded no greater weight than we accorded the freeze order, which we also recognized as a bargaining chip, in *Halliburton Co. v. Commissioner, supra.* For similar reasons, we also dismiss respondent's assertion that petitioner's mere possession of significant Iranian deposits created a reasonable prospect of recovery.

The long and the short of the matter is that respondent equates efforts to recover and hope of recovery with reasonable prospect of recovery. However appropriate that equation may be in the normal business context, we reject its use, as we did in *Halliburton,* in a situation such as was involved herein where the path to recovery was through a minefield of "delicate political, and diplomatic judgments in the complex arena of international, as well as domestic, relationships." See also *Colish v. Commissioner,* 48 T.C.711, 718 (1967) ("petitioner had nothing more than an expectancy, or hope for an interest in Czechoslovakian assets in this country"). [5] Even when added to the impact of the freeze order, the elements of the bankers' channel and the threat of a setoff having a speculative chance of success at best (both of which elements were submerged in a sea of political and economic pressures, domestic and international) are insufficient to tip the scales in favor of respondent's position.

We hold that petitioner has carried its burden of proof that it suffered losses deductible in 1979 in respect of its stock in Bank Dariush and IMDBI as a result of the

---

[5] We have not taken into account the effect, if any, of the equity side letter, see *supra* p. 180, which specifically negated the allocation of any amount of the settlement to the expropriation claims; we leave to another day the question whether this side letter should be considered binding in respect of the issue of whether there was in fact such a recovery in a later year and the impact of the tax benefit rule.

expropriation by Iran.[6] In view of this holding, we need not consider petitioner's alternative argument that the aforementioned stock was worthless irrespective of the expropriation.

> *An order will be entered holding for petitioner on the severed expropriation issue.*

---

[6]Our analysis and conclusion is equally applicable to the situation which existed at the time petitioner filed its 1979 return, namely, Sept. 5, 1980. Cf. *Qureshi v. Commissioner,* T.C. Memo. 1987-153.