MASHALLAH MOSHREFZADEH-SANI AND IRANDOKHT MOSHREFZADEH-SANI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Moshrefzadeh-Sani v. Commissioner
Docket No. 24636-90
United States Tax Court
T.C. Memo 1992-592; 1992 Tax Ct. Memo LEXIS 602; 64 T.C.M. (CCH) 989; October 5, 1992, Filed *602 Decision will be entered under Rule 155. For Petitioners: Barry Becker. For Respondent: Andrew J. Horning. RUWE
RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION RUWE, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for taxable years 1986 and 1987 in the amounts of $ 3,870 and $ 21,621, respectively. After concessions, the sole issue for decision is whether petitioners may deduct losses and the attendant carryovers from the expropriation of petitioners' property by the Iranian Government which they claim occurred during the years 1983, 1986, and 1987. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Peoria, Arizona, at the time they filed their petition. Prior to the end of 1979, petitioners were citizens and residents of Iran. Mashallah Moshrefzadeh-Sani (petitioner-husband) was an accomplished medical doctor in Iran. He had received his training in cardiology in the United States, and had established his own cardiology practice in Tehran. In addition, petitioner-husband was the director of the cardiology *603 hospital belonging to the mother of the Shah of Iran. Petitioner-husband had personally treated the Shah's mother and other members of the royal family. By 1979, petitioners were well established financially. They owned several parcels of real estate in Iran and the United States worth in excess of one million dollars. One of these parcels petitioners owned in Iran was located at Shahrake-Gharb. The Shahrake-Gharb property was purchased in 1976, and petitioners began construction of a two-story house on the land. The house was completed in 1979 and used as their personal residence. The total cost of the land and the house was approximately $ 400,000. Petitioners also owned real estate on the Iran-Iraq border (property No. 1). This land was acquired in 1962 at a reduced cost of $ 40,000 by virtue of petitioner-husband's service as an officer in the Iranian Navy. Petitioners also owned an undeveloped lot in a commercial area of Tehran near the American Embassy and the offices of the Iranian Oil Co. (property No. 2). Petitioners acquired this land for investment at a price of $ 280,000 in 1959. They also owned undeveloped land at Kakhe-Shomali in Tehran which petitioners purchased *604 in 1969 for $ 320,000 with the intention of building a multiple unit rental property (property No. 3). In 1979, Muslim fundamentalists, led by the Ayatollah Khomeini, revolted against the Shah and took control of the government in Iran. Members of the Baha'i religion, a minority religious sect in Iran, were persecuted by Khomeini and his followers. Both petitioners are members of the Baha'i religion. Petitioner-husband was one of nine members of the local Baha'i Spiritual Assembly. He also served as secretary of the Board of Trustees of the Missaghieh Hospital, which belonged to the Baha'i community. In November 1979, a former patient of petitioner-husband, a Muslim, notified him that his name was on a list of people to be arrested and executed by the revolutionary guard. Petitioner-husband left Iran immediately and came to the United States. Had he not left Iran immediately, he would have been arrested and executed. Of the nine members of his Baha'i Spiritual Assembly, three, including petitioner-husband, escaped and six were arrested and executed. If he had returned to Iran after November 1979, he would have been arrested and executed. When petitioner-husband escaped, *605 he took approximately $ 3,000 cash with him. Irandokht Rassai (petitioner-wife) managed to flee Iran one month after her husband. Prior to fleeing Iran, she was able to send her husband approximately $ 150,000 from Iran. Petitioners became resident aliens of the United States in December 1979 or January 1980. When petitioner-husband applied for and received his resident alien status, he anticipated staying the requisite 5 years to become a naturalized United States citizen in 1985. Petitioner-wife returned to Iran in 1980 for approximately 1 month in order to bring her sick mother to the United States. While in Iran in 1980, petitioner-wife executed a 1-year lease of their house and received an advance rental payment for one or two months. Petitioners received no further rental payments. Apparently, this was because the lessee discovered that petitioners were members of the Baha'i religion. In 1980 or 1981, petitioners took up residence in one of the San Diego condominiums that they owned. They sold the other condominium at this time for approximately $ 140,000. When they came to the United States, petitioners left behind all their Iranian real estate, petitioner-husband's *606 medical practice, and the equipment he used in that practice. The medical equipment included an X-ray machine and two electrocardiograms, for which petitioner-husband had paid approximately $ 50,000. At some point prior to petitioners' departure from Iran, petitioner-wife placed all documents relating to their real estate in a safe deposit box at Bank Melli of Iran. Petitioners were unable to retrieve any of these documents when they left Iran and have since been unable to obtain any of these documents. Petitioners filed timely Federal income tax returns for taxable years 1986 and 1987. On their original 1986 return, petitioners deducted $ 56,836 as a net operating loss carryover from prior years. [1] Petitioners filed an amended return for 1986 on May 12, 1988. The amended 1986 return claimed 1986 "losses of land from confiscation by the Islamic Republic of Iran pursuant to IRC 165(c)(2) and Rev. Ruling 62-197, 1962-2 CB 66" totaling $ 448,000. A schedule attached to the return listed the properties confiscated as those described previously as properties 1, 2, and 3. [2] On their 1987 return, petitioners carried forward the unused NOL's resulting from *607 the confiscation losses which they claimed they had suffered in 1986 and claimed additional 1987 confiscation losses of $ 50,000. Petitioner-husband has never been back to Iran since he left in 1979, nor has petitioner-wife been back since she went for her mother in 1980. Petitioner-husband began practicing as a physician in the United States in 1981. On their 1986 and 1987 income tax returns, petitioners reported wage income from petitioner-husband's medical *608 practice of $ 69,241.23 and $ 92,297.62, respectively. Petitioners also reported interest income for 1986 and 1987 in the respective amounts of $ 33,417 and $ 26,398. As a result of their claimed confiscation losses, petitioners reported that they owed no Federal income tax for either 1986 or 1987. Petitioners' 1987 return showed a remaining unused net operating loss of $ 301,599 which would be available to be carried over to offset income in future years. OPINION The issue for decision is whether petitioners suffered losses from expropriation in the years claimed. Section 165(a) provides for the deduction of losses sustained during the taxable year for which no compensation is received. [3] In the case of individuals, section 165(c) limits the deduction to losses incurred in a trade or business or in any transaction entered into for profit. In order to be deductible, a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and actually sustained during the taxable year. Boehm v. Commissioner, 326 U.S. 287, 291-292 (1945); United States v. S.S. White Dental Manufacturing Co., 274 U.S. 398 (1927); *609 sec. 1.165-1(b), Income Tax Regs.
The determination of whether a loss occurred during a particular taxable year is purely one of fact. Boehm v. Commissioner, supra at 293; Korn v. Commissioner, 524 F.2d 888, 890 (9th Cir. 1975), affg. T.C. Memo. 1973-258. "The test is a practical one, and does not depend upon an absolute forfeiture of all legal right. * * * The relevant consideration * * * is not the legal consequences of the seizure, but how completely the owner is dispossessed". Rozenfeld v. Commissioner, 181 F.2d 388, 390 (2d Cir. 1950), affg. a Memorandum Opinion of this Court dated June 6, 1949. A critical inquiry is to focus on the year that the taxpayer loses control over and possession *610 of the property at issue. United States v. S.S. White Dental Mfg. Co., supra; Ribas v. Commissioner, 54 T.C. 1347 (1970). The burden of proof is on petitioners to establish that the loss is deductible in the taxable year claimed. Rule 142(a); Burnet v. Houston, 283 U.S. 223, 227 (1931); Boehm v. Commissioner, supra at 294. Petitioners claim that in 1983, the Iranian Government expropriated petitioner-husband's medical equipment and petitioner's two-story house, which petitioners claim was constructed with the intent of using the first floor as a rental property and second floor as a personal residence. [4]
Petitioners also assert that in 1986, the Iranian Government expropriated three other parcels *611 of petitioners' real estate, all of which petitioners contend they had acquired for investment or in transactions entered into for profit. Respondent argues that petitioners have failed to prove that the properties were expropriated in the years claimed. More specifically, respondent argues that whatever property petitioners owned in Iran was lost when they fled Iran, and, therefore, any confiscation losses suffered by petitioners occurred prior to the years in which petitioners claim the losses occurred. Petitioners' assertion that their home and petitioner-husband's medical equipment were expropriated in 1983 was based upon a telephone call petitioner-wife received from a relative in Iran. Petitioner-wife could not remember what year she received the call, but she remembered that this relative had been notified by a family friend that petitioners' property had been confiscated. Apparently, this friend saw petitioner-husband's name on a property confiscation list in Iran during 1983. According to petitioners' testimony, if a person's property is confiscated by the government, notice is sent to the title companies and notary publics in Iran, since all transactions are processed *612 by title companies or notary publics. The notice is in the form of a list of names of people who may not buy or sell property. Petitioners offered into evidence a copy of a portion of a list of names (the list), purportedly part of a complete list of all persons whose property had been confiscated by the Iranian Government. Petitioner-husband's name is on this list. However, there is nothing on the list to indicate what it is. It has not been signed, it contains no date, and petitioner-husband was unable to remember when he received the copy of the list. We do not find the list to be reliable evidence of the expropriation of petitioners' property or the time such expropriation occurred. Even if petitioners had offered some evidence of when they received the telephone call and the copy of the list, it would only constitute evidence of when petitioners discovered that the property they owned had been confiscated, not when the confiscation took place. Discovery is only relevant to the extent a taxpayer seeks to deduct a loss from theft. Sec. 165(e). Confiscation or nationalization of property by a government does not constitute theft. Powers v. Commissioner, 36 T.C. 1191, 1192 (1961) *613 (citing Johnson v. United States, 291 F.2d 908, 909 (8th Cir. 1961)). Furthermore, petitioners have been aware since 1980 that someone was in possession of their home and was not paying them for that use. Consequently, it appears that petitioners suffered the loss of their house much earlier than 1983. See Korn v. Commissioner, supra at 890. With respect to the claimed 1986 losses, the only evidence petitioners offered as to when these losses occurred was a document purporting to be a certification of such confiscation. Petitioners claim to have received it in 1987. According to petitioner-husband's translation, [5] the document bears the emblem of the Ministry of Justice for the Islamic Republic of Iran and states as follows: This is to certify that according to the Verdict of [sic] Revolutionary Court of [sic] Islamic Republic, all the movable and immovable wealth of Dr. Mashallah Moshrefzadeh Sani, Son of Akbar has been confiscated in 1986 and forfeited to the government. Some of the items of his belongings are as follows: 1) A land situated at Kakhe Shomoeli St. Tehran. 2) A land situated at Roodsar St. *614 Tehran. 3) A land situated at Khorramshahr. 4) All Bank Inventory and Cash at Bank Melli of Iran. Petitioner-husband testified that the government official who prepared this document, prepared it for the purpose of giving it to a friend of petitioner-husband's in Iran. It therefore does not appear to have been created for any official purpose. [6] Petitioners offered no testimony or documents to corroborate that the official who prepared the document was, in fact, an official with knowledge of the expropriation, or when the alleged expropriation took place. The document itself bears no date. Moreover, petitioner-wife's testimony that the list sent to notaries was in existence in 1983 is, in our view, inconsistent with the notion that the Iranian Government expropriated petitioners' property in 1986. We do not believe that the purported certification is reliable evidence of when petitioners' property was confiscated. *615 Petitioners admitted at trial that they have had no control over any of their properties since they left Iran. There is nothing in the record to indicate that they would ever have been able to recover their property in Iran after they fled that country. Indeed, they fled Iran for the United States to save their lives which were threatened by the existing Iranian Government. Under the circumstances, it seems highly unlikely that there was any reasonable possibility that petitioners could have regained possession and control of their Iranian property after they fled with the intent to take up residence in the United States. Petitioners both testified that fighting between the Shah's forces and the Ayatollah's forces continued for 6 months after they left Iran, and that until 1983, they believed there was a chance the fundamentalist Muslim Government would collapse and they would be able to return to Iran. Petitioners have not demonstrated any basis for such an expectation. [7] In any event, it is clear that petitioners' assumptions and beliefs as to continued ownership are not decisive. [8]Boehm v. Commissioner, 326 U.S. at 292-293; Korn v. Commissioner, supra at 890. *616 In Boehm, the Court stated: a determination of whether a loss was in fact sustained in a particular year cannot fairly be made by confining the trier of facts to an examination of the taxpayer's beliefs and actions. Such an issue of necessity requires a practical approach, all pertinent facts and circumstances being open to inspection and consideration * * * [Boehm v. Commissioner, supra at 292.] *617 Petitioners appear to have conceded the issue of the 1987 expropriation losses which they claimed occurred in 1987 since they did not address it on brief. In any case, the evidence does not support a deduction for any such loss in that year. Petitioners testified at trial to the loss of a $ 20,000 account receivable due on the sale of a house, the loss of a $ 25,000 bank account, and to a loss of jewelry and gold bars and coins which were kept in petitioners' safe deposit box. Consequently, it is unclear which asset losses petitioners deducted on their 1987 return. There is no evidence in the record as to the value of the safe deposit box contents, and other than the 1987 return itself, petitioners made no showing that the purported losses of the account receivable or the bank account occurred in 1987. Petitioners have failed to prove that the claimed expropriation losses were sustained during the years in which they allegedly occurred. Therefore, petitioners are not entitled to the deductions in issue. Decision will be entered under Rule 155. Footnotes
1. According to petitioners' testimony, this loss carryover originated as a confiscation loss that occurred in 1983 when the Iranian government seized the Shahrake-Gharb property and petitioner-husband's medical equipment. Petitioners' returns for years prior to 1986 are not in evidence. ↩
2. The amended 1986 return indicates that $ 448,000 was the "cost basis" of the three properties. There is no explanation for the variance between the cost of those properties, as testified to by petitioners, and their "cost basis" as reported on the amended 1986 return.↩
3. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
4. The record does not establish the amount of loss deductions that were claimed on petitioners' 1983 return. Petitioners' returns for 1983, 1984, and 1985 were not offered as evidence.↩
5. Respondent does not dispute petitioner-husband's translation.↩
6. Petitioner-husband testified that the official who prepared the certification risked his life in creating and giving this document to petitioner-husband's friend.↩
7. We have on previous occasions found that, as early as 1979, other taxpayers had no reasonable prospect of recovery with respect to property expropriated by the Islamic Republic of Iran. Continental Illinois Corp. v. Commissioner, 94 T.C. 165 (1990); Haliburton v. Commissioner, 93 T.C. 758 (1989), affd. 946 F.2d 395↩ (5th Cir. 1991). 8. Petitioner-wife testified that until the properties were confiscated, she could have renounced her Baha'i religion, became a Muslim, and returned to Iran to reclaim their properties. This strikes us as a highly dubious assertion for which petitioners have failed to offer any corroboration. Even if true, it adds nothing to establish the date of expropriation.↩